**AMERICAN MARITIME ASSOCIATION,**
New York, New York, Plaintiff,

v.

Maurice H. **STANS,** individually, and as Secretary of Commerce, Washington, D. C., et al., Defendants

and

United States Lines, Inc.,

and

Liner Council, American Institute of Merchant Shipping, Intervenors.

Civ. A. No. 2090–70.

United States District Court, District of Columbia.

July 12, 1971.

As Amended Sept. 14, 1971.

**1180**

Commander of the Military Sea Transportation Service (hereinafter "MSTS") stating that the Maritime Administration (hereinafter "MARAD") would not oppose the charter to MSTS by intervenor—defendant United States Lines (hereinafter "USL") of certain vessels built with construction differential subsidy pursuant to the provisions of Title V of the Merchant Marine Act, 1936, 46 U.S.C. § 1151 et seq.[1] Plaintiff, the American Maritime Association (hereinafter "AMA"), is an association of unsubsidized shipping companies, representing the largest grouping of independent unsubsidized carriers under the American flag. Defendants Gibson, Blackwell and Bowman are officials of the Maritime Administration and of the Maritime Subsidy Board (hereinafter "MSB"), which in turn carry out certain functions assigned to the Secretary of Commerce by the Merchant Marine Act of 1936, 46 U.S.C. § 1101 et seq. *See* Reorganization Plan No. 7 of 1961, 75 Stat. 840, and Reorganization Plan No. 21 of 1950, 64 Stat. 1273. Intervenor—defendant Liner Council, American Institute of Merchant Shipping (hereinafter "AIMS") is an association of 12 steamship companies each of which receives subsidies under the Act.

Joseph Klausner, Washington, D. C., for plaintiff.

Leavenworth Colby, Dept. of Justice, Washington, D. C., for defendant.

Robert T. Basseches, Washington, D. C., for intervenor A.I.M.S.

Edward Schmeltzer, Washington, D. C., for intervenor U.S.L.

## OPINION AND ORDER

BRYANT, District Judge.

The complaint in this case seeks review of allegedly final agency action in the form of a letter written by defendant Gibson, Maritime Administrator, to the

I

The aim of the Merchant Marine Act, 1936, is the development of a Merchant Marine to carry the water borne domestic and foreign commerce of the United States and to serve as a naval and military auxiliary in time of war or national emergency, 46 U.S.C. § 1101. Title V of the Act provides for construction subsidy (hereinafter "C.D.S.") and title VI provides for operating subsidy (hereinafter "O.D.S."). Without such subsidies American shipping could not possibly be competitive with that of foreign nations, where costs are much lower.

---

1. Unless otherwise indicated, all references to the Merchant Marine Act are to the language as it existed prior to the amendments of October 21, 1970, Pub.L. 91–469, 84 Stat. 1018, 46 U.S.C. § 1101 et seq. (Supp.1971).

Because the posture of the case as we dispose of it on the motions for summary judgment made by all the parties is quite different from what it was at the time the complaint was filed, a somewhat extensive chronology must be given.

On July 1, 1969, AMA petitioned the Secretary of Commerce for the initiation of a rule making proceeding concerning various aspects of the grant of subsidies to ships which carry cargo by law reserved to American flag vessels. On December 3, 1969, MARAD caused to be published in the Federal Register a Notice of Fact-Finding Hearing, denominated Docket S–244, relative to AMA's proposed rules. The notice recited that

"[N]otwithstanding that section 4 of the Administrative Procedures [sic] Act, 5 U.S.C.A. 553, exempts subsidy programs from rule making, the Board, in the exercise of its discretion, will develop a fact record in a public hearing in order that it will be in a position to make a considered administrative review of the issues presented in the AMA petition." Complaint, Exhibit C.

In the interim, on November 14, 1969, AMA filed a memorandum of law with MARAD/MSB (hereinafter "the Board") asserting that no statutory authority existed for long-term charters to MSTS of ships built with C.D.S. The issue raised in the memorandum was made the subject of a Supplemental Notice of Fact-Finding Hearing in Docket S–244 published in the Federal Register on April 4, 1970. Complaint, Exhibit G. The issue was deemed a question of law not dependent on any contested factual issue and a briefing schedule was established. Plaintiff filed its brief in the supplemental docket on May 1, 1970; answering briefs from AIMS and USL were filed on July 13 and July 15, respectively.

Meanwhile, on June 3, 1970, MSTS issued a request for proposals to charter vessels for various time periods, renewa-ble at the charterer's option for up to five years. Offerors were required to submit "evidence in the form of a MARAD written agreement that the offered ships will not be precluded from performing for MSTS for the charter period (including optional periods offered) by reason of MARAD prohibition." Intervenor USL's Cross-Motion for Summary Judgment, Exhibit 3. On June 4, USL submitted a bid to MSTS. On June 12, 1970, while the administrative proceeding was pending and before answering briefs had been filed, defendant Gibson, at the request of USL, wrote to the Commander of MSTS advising that the vessels offered by USL "will not be precluded from performing for MSTS for the charter period (including optional periods offered) by reason of MARAD prohibition." Complaint, Exhibit A. No mention was made by Mr. Gibson of the pendency of any rule making proceeding. On June 26, MSTS announced the award to USL of charters of 14 vessels, each of which had been built with the aid of C.D.S., for charter periods of three to twelve months, renewable at MSTS' option for extensions of three to five years. USL's Cross-Motion for Summary Judgment, Exhibit 4. Plaintiff instituted this action on July 13, 1970, and moved for summary judgment on October 9. On October 13, 1970, the Board issued its final decision in Supplemental Docket S–244—"Legality of Certain Charters to MSC of Vessels Built with Construction —Differential Subsidy." [2] Intervenor AIMS' Motion for Summary Judgment, Attachment 3. That decision was adverse to plaintiff.

The theory of the complaint and of plaintiff's motion for summary judgment is that the June 12 letter from defendant Gibson to the Commander of MSTS amounted to final and therefore reviewable action in the administrative proceeding. The complaint requests the court to reverse the approval of the charters, to command the defendants to withdraw the June 12 letter, and to

2. MSC stands for Military Sealift Command, the name by which the Military Sea Transportation Service is presently known.

dispose of the underlying controversy either by trial on the merits or by remanding the matter to the Board "for orderly hearing and decision in accordance with law."

In view of the fact that we now have what is concededly the Board's final decision and opinion in the rule making proceeding which is the subject of this action, the court has concluded that it would be a sterile and wasteful exercise to review the case without reference to that decision. If the court were to determine that the June 12 letter was final action for purposes of review, the proper course would be to remand the matter to the Board for an orderly decision—but we already know to a certainty what that decision and what its reasoning would be. This court clearly has jurisdiction to review final action of MARAD/MSB. Administrative Procedure Act, Section 10, 5 U.S.C. § 703; Pacific Far East Line, Inc. v. Federal Maritime Board, 107 U.S.App.D.C. 155, 275 F.2d 184, cert. den. 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1523 (1960). Though plaintiff has not chosen to amend its complaint to request review of the October 13 decision, plaintiff and each of the other parties have extensively briefed the merits of that decision and a great deal of time was devoted to it at oral argument. In the interests of judicial efficiency, the court deems the complaint amended to request review of the October 13 decision, F.R.Civ.P. 15 (b).

Because the court is in full agreement with plaintiff that defendant Gibson's action in writing the June 12 letter to MSTS constituted a gross deviation from acceptable administrative procedure, it is essential to note that Mr. Gibson was not a member of the MARAD/MSB panel that made the October 13 decision. Had he been a member, a troublesome question of the October 13 decision's invalidity *per se* would arise. Amos Treat & Co. v. Securities Exchange Commission, 113 U.S.App.D.C. 100, 306 F.2d 260 (1962).

When in the initial Notice of Fact-Finding Hearing in Docket S–244, the Board announced that it would "develop a fact record in a public hearing,[3] "it chose to make the proceeding subject to the most rigorous requirements of the Administrative Procedure Act.[4] One of those requirements is that the decision of the agency be made on the basis of the record. A.P.A. § 7, 5 U.S.C. § 556 (e). The supplemental notice of April 4 established that the proceeding involving the legality of charters of C.D.S. vessels to MSTS would be considered as part of Docket S–244—and, hence, subject to the same requirements.[5]

We come, then, to the July 12 letter from the Maritime Administrator to MSTS warranting that MARAD would interpose no objection to the charter to MSTS of the USL vessels built with construction-differential subsidy. Defendants' attempt to characterize this letter as a mere refusal to grant plaintiff interlocutory relief during the pendency of the rule making proceeding is totally unrealistic. Certainly Mr. Gibson was not obliged to tell MSTS that MARAD would interpose objections; just as certainly he was obliged to refrain from making any definitive statement of MARAD's position pending the outcome of the rule making proceeding. The June 12 letter confronts us with the spectacle of an

---

3. supra, p. 3.

4. MARAD's Rule 6 (Rule Making) § 201.-63 provides: "Interested persons will be afforded an opportunity to participate in rule making through submission of written data, views, or arguments, with or without opportunity to present the same orally in any manner: *Provided,* That where the proposed rules are such as are required by statute to be made on the record after opportunity for a hearing, or *where a hearing is ordered by the Administration* upon petition of any party or *upon its own initiative, such hearing shall be conducted pursuant to sections 7 and 8 of the Administrative Procedure Act."* (Emphasis added.) 46 C.F.R. § 201.63.

5. Except, of course, that evidence would not be taken, since the matter was deemed to involve a question of law not dependent on any contested factual issue.

agency head going completely outside of a pending rule making proceeding, at the request of one of the parties to the proceeding, to issue a flat statement of what the agency's position was with respect to the precise issue raised in the proceeding. This illustration of an appalling backwardness in administrative procedure is apparently the rule rather than the exception with MARAD. *See* American Mail Line, Ltd. v. Gulick, 133 U.S.App.D.C. 382, 411 F.2d 696 (1969); Moore-McCormack Lines, Inc. v. United States, 413 F.2d 568, 188 Ct.Cl. 644 (1969); New York Shipbuilding Corp. v. United States, 385 F.2d 427 (Ct.Cl. 1967); United States v. Marietta Manufacturing Co., 268 F.Supp. 176 (D.W.Va. 1967).

## II

■ On the merits, plaintiff's position that the long-term charter of vessels built with C.D.S. to MSTS is illegal is based on two propositions. First, and in a sense preliminarily, plaintiff asserts that Section 902 of the Merchant Marine Act, 1936, 46 U.S.C. § 1242, provides the exclusive method by which the military may obtain commercial vessels for military use in a time of national emergency. The state of national emergency proclaimed by President Truman in 1950, 15 Fed.Reg. 9029, has yet to be rescinded. Concededly the charters in question have not been made pursuant to Section 902. Secondly, says plaintiff, long-term charter of C.D.S. vessels to the military violates the requirement of Section 506 of the Act that C.D.S. vessels be operated exclusively in foreign trade, 46 U.S.C. § 1156. The Board in its October 13 decision disagreed with plaintiff on both these propositions. We affirm the Board, mindful that in construing a statute that has been interpreted by the agency charged with administering it, a reviewing court should affirm the agency's interpretation if it is reasonable and not inconsistent with ascertainable legislative intent. Udall v. Tallman, 380 U.S. 1, 14, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); National Automatic Laundry

and Cleaning Council v. Schultz, 443 F.2d 689 (D.C.Cir., 1971).

### Section 902 of the Act

■ Section 902(a) of the Merchant Marine Act, 1936, provides in relevant Part:

"Whenever the President shall proclaim that the security of the national defense makes it advisable or during any national emergency declared by proclamation of the President, it shall be lawful for the Secretary of Commerce to requisition or purchase any vessel or other watercraft owned by citizens of the United States, or under construction within the United States, or for any period during such emergency, to requisition or charter the use of any such property." 46 U.S.C. § 1242(a).

The section authorizes the Secretary to transfer possession or control over any vessel taken under it to any department or agency of the Government. The section contains elaborate provisions for determining and paying just compensation for the vessels taken; it provides specifically that the amount of any C.D.S. paid for a vessel taken under the section shall be deducted from the compensation otherwise payable for that vessel.

Section 902's establishment of a requisitioning authority in the Secretary of Commerce in the terms "it shall be lawful * * *" is certainly no indication that the authority granted is the *exclusive* means by which the government can charter ships in a national emergency. A reasonable reading of the statutory language is that the special authority it grants to bring about the desired result, *i. e.* availability to the military of commercial ships, is *in addition to* whatever other means may exist to bring about the same result. Senator Copeland, Chairman of the Committee on Commerce, noted in the course of hearings on the Merchant Marine Act that "Section 902 has to do with the sudden taking over of vessels." Hearings on S. 2582 Before Senate Committee on

Commerce, 74th Cong., 1st Sess., p. 44 (1935).

If evidence *dehors* Section 902 is needed to show that the requisitioning authority it establishes in the Secretary of Commerce does not exclude a power in the military to charter vessels directly, that evidence exists in abundance.

The Armed Services Procurement Act, 10 U.S.C. § 2303, where it refers to "the purchase and contract to purchase * * of all property * * * including * * (4) vessels," has reference to the chartering of vessels. S.Rep. No. 571, 80th Cong., 1st Sess., p. 8 (1947). The Department of Defense [6], the Department of the Army [7], and MSTS all have published regulations dealing explicitly with the chartering of ships [8].

During World War II, Section 902 requisitions were the exclusive means by which the military acquired commercial ships; however the War Department informed Congress that in its view this practice was one of convenience rather than legal necessity [9]. During the Korean War, MSTS time chartered 37 vessels from operating subsidy carriers. Four of these vessels were built with C.D.S. and were subject to the restrictions of Section 506 of the Merchant Marine Act, 1936 [10]. In 1964, ten commercial ships, including eight built with C.D.S.[11], were chartered by MSTS for "Operation Steel Pike," an exercise designed to test the integration of commercial vessels into military requirements under simulated wartime conditions. This chartering was specifically made known to Congress [12]. In connection with the war in Viet Nam, MSTS has engaged very extensively in the chartering of merchant vessels—again including C.D.S. vessels [13] and again made known to Congress [14].

In 1968 the Department of Defense and the subsidized operators entered into an agreement for allocation of military cargoes on ordinary berth terms to operators who agreed to charter their vessels to MSTS upon certain military contingencies. The validity of this program, known as "RESPOND", was upheld by the Comptroller General over the objection of the unsubsidized car-

6. 32 C.F.R. § 1.401(d).

7. 32 C.F.R. §§ 632.3, 632.4.

8. 32 C.F.R. §§ 174.1(e), 174.3(e) and (f).

9. Hearings on H.J.R. 16 and H.R. 4088 Before House Committee on Merchant Marine and Fisheries, 77th Cong., 1st Sess., p. 117 (1941). (Colloquy between Congressman Harris and Lt. Commander Reynolds, Chief of Transportation Division, War Department.)

10. A list of the chartered vessels is contained in Attachment 4 to Intervenor AIM' Memorandum of Points and Authorities in Support of Cross-Motion for Summary Judgment. The accuracy of this list was conceded by plaintiff at oral argument.

11. "Operation Steel Pike I," Hearings Before House Committee on Merchant Marine Fisheries, 89th Cong., 1st Sess. p. 3, (1965).

12. *Id.* These hearings, at 61–62, include an explicit statement by Admiral Donaho of MSTS of the relationship between MSTS charters and Section 902 requisitions:

"Mr. Rogers. Do you have the authority to call into service any of the subsidized lines during peacetime?

"Admiral Donaho. We do not have authority to 'call into service' any ships during peacetime. Chartering or other contractual arrangements are used to acquire needed commercial capability.

"Mr. Rogers. Now, in any national emergency you have the authority to call in any of the American merchant marine ships?

"Admiral Donaho. Not without proclamation of requisitioning authority as Mr. Johnson referred to earlier.

*       *       *       *       *

"Mr. Rogers. Do you use any of the American merchant marine in your normal operations, everyday peacetime normal operations?

"Admiral Donaho. We do. We have a few chartered ships. We have shipping contracts with subsidized and nonsubsidized operators. * * *"

13. "Viet Nam Shipping Policy Review," Hearings Before House Committee on Merchant Marine and Fisheries, 89th Cong., 2d Sess., pp. 364–365 (1966).

14. *Id.*

riers that Section 902 provided the exclusive means by which the military could augment its sealift capacity in the time of emergency [15].

The Merchant Marine Act of 1936 was reenacted in 1952, 66 Stat. 760, and again in 1970, 84 Stat. 1018. A long-standing administrative interpretation applying to a substantially reenacted statute is deemed to have received congressional approval and has the effect of law. Commissioner of Internal Revenue v. Noel Estate, 380 U.S. 678, 682, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965). Application of the rule of congressional acquiescence seems particularly appropriate where, as here, the long-standing administrative interpretation has been specifically made known to Congress at various times.

In sum, the interpretation of MARAD/ MSB that Section 902 does not provide the exclusive means by which the military can obtain charter use of commercial vessels is neither unreasonable nor contrary to ascertainable legislative intent.

## Section 506 of the Act

■ Plaintiff's principal contention before the Board and the court is that when a vessel built with C.D.S. is chartered to MSTS it is not being operated "exclusively in foreign trade," as is required by Section 506 of the Act [16]. That is, though MSTS uses the C.D.S. vessels exclusively in voyages between the United States and a foreign country, since the supplies are being transported from a U. S. military base here to a U. S. military base there, there is no "trade" at all. The Board's opinion gives the term "foreign trade" as used in Section 506 a purely geographical significance, rejecting the notion that

foreign trade necessarily connotes an exchange of ownership of the goods transported between this country and a foreign country.

The term "foreign trade" is defined in Section 905(a) of the Act as follows:

"The words 'foreign commerce' or 'foreign trade' mean commerce or trade between the United States, its Territories or possessions, or the District of Columbia, and a foreign country." 46 U.S.C. § 1244(a).

While the use of a word to define a phrase containing that word is hardly an invaluable aid to clarification, it would seem fair to infer from Congress' failure to define the word "trade" in the expression "foreign trade" that its concern was much more with the element of "foreign" than with the element of "trade."

The Board points out that it has held military time charters of subsidized vessels to the same restrictions governing geographical areas of operations as those imposed upon commercial charters of such vessels. Thus, the Board has ruled that the prohibition of Section 805(a) of the Act, 46 U.S.C. § 1223(a), against O.D.S. carriers operating in the domestic service applied when the vessels in question are under time charter to MSTS.

"[W]e perceive no basis for adopting a narrow interpretation of the domestic services or operations included therein so as to exclude irregular domestic movements even if the movements involved are under a time charter and are restricted to military cargoes." AEIL, Inc.—MSTS Chartered Vessel, 9 Pike & Fischer, Shipping Regulation Reports, 997, 1001 (1968).

In arguing that a construction of "foreign trade" in Section 506 of the

---

15. Pike & Fischer, Shipping Regulation Reports 10,287 (October 11, 1968).

16. "Every owner of a vessel for which a construction-differential subsidy has been paid shall agree that the vessel shall be operated exclusively in foreign trade, or on a round-the-world voyage, or on a round voyage from the west coast of the United States to a European port or ports

which includes intercoastal ports of the United States, or a round voyage from the Atlantic coast of the United States to the Orient which includes intercoastal ports of the United States, or on a voyage in foreign trade on which the vessel may stop at an island possession or island territory of the United States, * * * " 46 U.S.C. § 1156.

Act as including MSTS charters would be inconsistent with legislative intent, plaintiff has reference to Section 501(a) of the Act which outlines the purposes for which C.D.S. may be given:

"Any citizen of the United States may make application to the Federal Maritime Board for a construction-differential subsidy to aid in the construction of a new vessel to be used in the foreign commerce of the United States. No such application shall be approved by the Board unless it determines that (1) the plans and specifications call for a new vessel which will meet the requirements of the foreign commerce of the United States, will aid in the promotion and development of such commerce, and be suitable for use by the United States for national defense or military purposes in time of war or national emergency; * * *" 46 U.S.C. § 1151(a).

"Foreign commerce" in Section 501(a), says plaintiff, should be equated with foreign-flag competition, because it is clear from the legislative history that the reason Congress deemed subsidies necessary was in order that American ships should be competitive with the much lower cost foreign ships. However, since the carriage of military supplies is by law limited to U. S. flag vessels, 10 U.S.C. § 2631, there is by definition no foreign competition for MSTS charters. Therefore, construing Section 506 consistently with Section 501, "foreign trade" should be held to require foreign competition and therefore to exclude charters to MSTS.

The problem with plaintiff's argument is that the phrase "foreign-flag competition" which it suggests should be read into Section 501 was excised from that section in the 1952 amendments. Section 501(a), as it existed from 1936 to 1952, read:

"Any citizen of the United States may make application to the Commis-

sion for a construction-differential subsidy to aid in the construction of a new vessel, to be used on a service, route, or line in the foreign commerce of the United States, determined to be essential under section 211 of this Act. No such application shall be approved by the Commission unless it determines that (1) the service, route, or line requires a new vessel of modern and economical design to meet foreign-flag competition and to promote the foreign commerce of the United States; * * *" June 29, 1936, c. 858, §§ 501, 905(e), 49 Stat. 1995.

As originally enacted, then, Section 501 of the Act prescribed the same requirement for receipt of C.D.S. as is prescribed for eligibility for O.D.S.—that the vessel be operated on a service, route or line essential to the foreign commerce of the United States wherein there is foreign flag competition. 46 U.S.C. § 1171. The purpose of the 1952 amendments to Section 501(a) was to make C.D.S. available for the construction of non-liner vessels, vessels operating in the foreign trade of the United States but not tied to any particular service or route.[17] Since after the 1952 amendments a commitment to operate on a particular route would no longer be required for receipt of C.D.S., there could be no way to ensure that the vessels for which the subsidy was given would in fact encounter foreign competition.

Finally, it is clear from Section 501(a) of the Act that a major purpose of the construction-differential subsidy program is to ensure the availability of American merchant vessels "for use by the United States for national defense or military purposes in time of war or national emergency." 46 U.S.C. § 1151(a). We have been in a presidentially declared state of national emergency since 1950. 15 Fed.Reg. 9029. This would seem to settle the validity of the MSTS charters of C.D.S. vessels, for at

17. S.Rep.No. 295, 82nd Cong., 1st Sess. (1951); H.R.Rep. No. 1407, 81st Cong., 1st Sess. (1949).

least so long as the national emergency continues. Plaintiff attempts to overcome the force of this argument by its contention that in fact the use to which MSTS puts the C.D.S. vessels is a non-emergency use. This may well be the case, but all that the statute requires is that the use be "for national defense or military purposes in time of war or national emergency." 46 U.S.C. § 1151 (a). There is no allegation that MSTS is not using the ships for military purposes; indeed there is no question but that the vessels are used to carry military supplies. That being the case, the court is without power to review the manner in which MSTS deploys the vessels under its control. Curran v. Laird, 136 U.S.App. D.C. 280, 420 F.2d 122, (en banc, 1969).

It is by the court this 12th day of July, 1971,

Ordered that plaintiff's motion for summary judgment is denied, and it is further

Ordered that the motions for summary judgment of the defendants, of intervenor—defendant Liner Council, American Institute of Merchant Shipping, and of intervenor—defendant United States Lines are granted.