STATES MARINE INTERNATIONAL, INC., et al., Plaintiffs,

v.

Peter G. PETERSON, Secretary of Commerce, et al., Defendants-Appellants,

v.

LINER COUNCIL, AMERICAN INSTITUTE OF MERCHANT SHIPPING, Intervenor-Appellee.

AMERICAN MARITIME ASSOCIATION, Plaintiff-Appellant,

v.

Peter G. PETERSON, Secretary of Commerce, et al., Defendants-Appellants,

v.

LINER COUNCIL, AMERICAN INSTITUTE OF MERCHANT SHIPPING, Intervenor-Appellee.

Nos. 74–1499, 74–1502.

United States Court of Appeals, District of Columbia Circuit.

Argued April 17, 1975.

Decided Sept. 5, 1975.

Michael Kimmel, Atty., Dept. of Justice, for defendants-appellants in No. 74–1499. Carla A. Hills, Asst. Atty. Gen., at the time the brief was filed, Earl J. Silbert, U. S. Atty., Leonard Schaitman and James C. Hair, Jr., Attys., Dept. of Justice, and James F. Ford, Atty., Maritime Administration, Dept. of Commerce were on the brief for defendants-appellants in No. 74–1499.

Joseph A. Klausner, Washington, D. C., for appellant in No. 74–1502.

Warner W. Gardner, Washington, D. C., with whom Robert T. Basseches and Odell Kominers, Washington, D. C., were on the brief for Liner Council American Institute of Merchant Shipping.

Robert N. Kharasch, Washington, D. C., entered an appearance for States Marine International, Inc., and others, in No. 74–1499.

Before MacKINNON and WILKEY, Circuit Judges, and JAMESON,* United States Senior District Judge for the District of Montana.

Opinion for the Court filed by Senior District Judge JAMESON.

JAMESON, Senior District Judge:

This is an appeal from an order holding that, under the Merchant Marine Act of 1936, 46 U.S.C. § 1101 et seq., the Maritime Subsidy Board may not limit or reduce the award and payment of an operating differential subsidy (ODS) for the carriage of preference cargo, i. e., cargo reserved by law for carriage only on United States flag ships.

Plaintiff-appellant, American Maritime Association (AMA), an organization of independent unsubsidized American flag carriers, and two other plaintiffs[1] brought these actions to challenge a final order of the Maritime Subsidy Board (1) requiring subsidized shipping lines to carry at least 50% non-preference cargo and providing for the proportional reduction in subsidies for vessels earning less than 50% of freight revenues from non-preference cargo; and (2) rejecting AMA's contention that the owner of a vessel built with a construction differential subsidy (CDS) on which an operating subsidy is paid should be required to rebate the construction subsidy where the vessel fails to "meet foreign-flag competition". The American

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. States Marine International, Inc. and Isthmian Lines, Inc., plaintiffs below, have not appealed in No. 74–1499. The federal appellants, Peter G. Peterson, Secretary of Commerce, et al., have appealed in both cases.

Institute of Merchant Shippers (AIMS), an association of subsidized ocean carriers, intervened and contended that the Merchant Marine Act does not permit any reduction of subsidies because of the carriage of preference cargo. The district court agreed and granted intervenor-appellee's motion for summary judgment.[2]

The federal appellants, including the Secretary of Commerce, Maritime Administration, and Maritime Subsidy Board, contend that the court erred in adopting the intervenor's position insofar as it conflicts with the order of the Board. Appellant AMA contends that the court erred in failing to hold that the payment of any subsidy, ODS or CDS, is precluded when vessels carry preference cargo. In addition, AMA argues that the Board erred in its formulae for determining the existence of "substantial competition", in failing to find that double subsidies were being paid, and in not ruling that the subsidy program was creating unfair competition. In essence the cases involve the interaction of provisions of the Merchant Marine Act of 1936 and various acts providing a preference for American ships with respect to the carriage of certain cargo.

## BACKGROUND

### The Merchant Marine Act of 1936

The Merchant Marine Act of 1936 was enacted to foster the development and continued maintenance of a modern Merchant Marine fleet. The Act recognized that, "It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic waterborne export and import foreign commerce of the United States to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times,

(b) capable of serving as a naval and military auxiliary in time of war or national emergency . . .". 46 U.S.C. 1101(a, b) (1970). To accomplish this purpose the Act established two subsidies for American flag carriers, an operating differential subsidy (ODS) and a construction differential subsidy (CDS).

Under section 601 of the Act, 46 U.S.C. § 1171(a), the Secretary of Commerce is authorized to grant an ODS only if he determines that (1) the operation of such vessel or vessels in an essential service is *required to meet foreign flag competition* and to promote the foreign commerce of the United States"; (2) the applicant's vessels are such as are required to enable him to operate in an essential service, "in such a manner as may be *necessary to meet competitive conditions*, and to promote foreign commerce"; (3) the applicant possesses the qualifications "necessary to enable him to *conduct the proposed operations of the vessel or vessels as to meet competitive conditions* and promote foreign commerce"; and (4) the subsidy "is necessary to place the proposed operations of the vessel or vessels on *parity with those of foreign competitors*, and is reasonably calculated to carry out effectively the purposes and policy of this Act". (Emphasis added).

The CDS is authorized under 46 U.S.C. § 1151 *et seq.* to aid in construction of vessels to be used in the foreign commerce of the United States. As with the ODS, the Secretary of Commerce is required to determine that the applicant meets various criteria, including a determination that the vessel "will meet the requirements of foreign commerce of the United States, will aid in the promotion and development of such commerce, and will be suitable for use by the United States for national defense or military purposes in time of war or national emergency". § 1151(a). Unlike the ODS there is no requirement that the

---

**2.** In a footnote, the court stated that the issues relating to the construction differential subsidy were precluded by the court's decision in

*American Maritime Association* v. *Stans*, 329 F.Supp. 1179 (D.D.C.1971) *aff'd*, 157 U.S.App. D.C. 394, 485 F.2d 765 (1973).

granting of the construction subsidy be necessary to "meet foreign flag competition."[3]

### Cargo Preference Legislation

In order to promote American flag carriers, Congress from time to time has enacted statutes providing that shipments of certain American cargo must be carried exclusively or primarily in ships of United States registry. In 1904, the first of these statutes, the Cargo Preference Act, 10 U.S.C. § 2631, provided that only vessels of the United States may be used in transporting American military supplies. Numerous other preferences discussed *infra* were enacted later. In 1954 Congress amended the 1936 Act to require in 46 U.S.C. § 1241(b) that whenever government owned or financed cargo is shipped, at least 50% of the gross tonnage must be carried on privately owned vessels of United States flag registry. The effect of the acts is to guarantee that substantial quantities of both civilian and military cargo will be shipped on American vessels.

### Proceedings before Maritime Subsidy Board

Seeking relief from what it considered unfair competition,[4] AMA on July 1, 1969 petitioned the Secretary of Commerce to exercise his rule making authority under the Merchant Marine Act, 46 U.S.C. § 1114(b), to adopt four rules governing administration of the ODS

and CDS programs. Its proposed rules reflected AMA's position that neither ODS nor CDS could be awarded or paid, in full or in part, for the carriage of preference cargoes.[5] On December 1, 1969 the Maritime Subsidy Board, on behalf of the Secretary of Commerce, commenced rule making proceedings, under Docket No. S–244, to consider the relationship between ODS and CDS and preference cargo. Extensive hearings were held in which the American Unsubsidized Lines (AUL) joined the AMA in representing the unsubsidized carriers. The AIMS, United States Lines, Inc., and the Military Sealift Command of the Department of Defense represented the subsidized lines.

On June 22, 1971 the Chief Hearing Examiner of the Board issued proposed Findings of Fact in which he recommended, *inter alia*, that the AMA proposed rule calling for the refund of ODS proportionate to revenues derived from preference cargo be adopted with respect to military and open-rated civilian preference cargo carried at premium rates. The Examiner further concluded that open-rated civilian preference cargo should not be the subject of subsidy refund. Appeal was taken to the Board.

The Board issued its Final Order and Opinion on June 12, 1972. It declined to adopt the rules proposed by the AMA and rejected the legal conclusions of the examiner. Instead the Board formulated a new rule and regulations to govern the award of future subsidy contracts.[6]

---

**3.** Prior to 1952, 46 U.S.C. § 1151 did require the Board to establish that the proposed construction was necessary "to meet foreign-flag competition" before granting a subsidy.

**4.** AMA contended that subsidy payments to vessels handling preference cargo are in contradiction to the stated purposes of the subsidy statute to subsidize ships competing with foreign vessels. Subsidized lines can use their subsidies to make bids on military and preference cargoes necessarily below the costs for unsubsidized vessels. The problem has increased with the end of the Vietnam involvement and has resulted in the demise of some unsubsidized lines.

**5.** AMA filed its petition on behalf of its 78 member steamship companies which were un-

subsidized under the Act and which relied heavily on preference cargoes for their livelihood.

**6.** The June 12, 1972 Final Order and Opinion is reported in Pike & Fischer, 13 S.R.R. 44 (1972). The proposed regulations were published for comment in the Federal Register on July 18, 1972 (37 F.R. 14236). In response to comments minor revisions were made and final regulations, which became effective January 1, 1973, were promulgated October 4, 1972 and published in the Federal Register on October 7, 1972 as Part 280 of 46 C.F.R. (37 F.R. 21323).

In concluding that it could not accept the position of either AMA or AIMS with regard to the meaning of the 46 U.S.C. § 1171(a) requirement that vessels "meet foreign-flag competition", the Board said:

"The Board specifically rejects AMA's contention that subsidized vessel operations must be devoted almost exclusively to carriage of cargo subject to foreign-flag competition in order to qualify for an ODS contract. The Board also rejects AMA's contention that ODS may be paid under a valid contract only for carriage of cargo subject to foreign-flag competition. We think the statute and its legislative history clearly establish that the purpose of the ODS program is not to subsidize cargo carriage but instead to subsidize operation of vessels so that the vessels are in a position to carry cargo on a competitive basis. On the other hand, we do not accept the AIMS position that the actual performance of a vessel operator as a competitor can be ignored. Rather, it is our judgment that payment of subsidy for operation of vessels must be governed by the degree to which the competitiveness of that operation is reflected in actual operating experience."

The Board determined that the following three principles would apply in any future award and payment of ODS:

"First, no ODS contract will be awarded unless the applicant can establish that the vessel operations proposed to be subsidized will be conducted in a manner which will not preclude the applicant from earning a substantial portion of its gross freight revenues for each service covered by the application from the carriage of car-

goes subject to foreign-flag competition. Secondly, ODS will be paid in full for vessel operations on each service covered by an ODS contract only if a substantial portion of the gross freight revenues earned for that service are earned from the carriage of cargoes subject to foreign-flag competition. Thirdly, to the extent that less than a substantial portion of the gross freight revenues earned for a service are earned from carriage of cargo subject to foreign-flag competition, CDS payable under the ODS contract for that service will be reduced in proportion to the decreased gross freight revenues earned from such carriage. In each of the three cases, 'substantial portion' is interpreted by the Board to mean 50%." [7]

The Board issued regulations establishing a sliding ODS payment schedule for vessels having less than 50% of the cargo subject to foreign competition.

Utilizing these standards, the Board divided preference cargoes into their component parts of military preference cargoes and civilian preference cargoes. The Board held that military cargo is never subject to foreign competition; nor is civilian preference cargo carried at premium rates (agricultural commodities shipped pursuant to Department of Agriculture or AID programs which are exclusively handled by American shippers). The Board found, however, that other classes of civilian preference cargo—cargo shipped at rates established by international conferences (conference-rated), shipped at rates negotiated between the parties (open-rated), or shipped at prevailing competitive rates (world-rated)— were subject to foreign-flag competition. [8]

---

**7.** The Board specified two situations in which cargo is "subject to foreign-flag competition":

"The first is where a U.S.-flag carrier seeking to carry cargo faces at least one foreign-flag carrier who is eligible to carry the same cargo and who is reasonably likely to bid for and be available to carry the cargo. The second situation is where a U.S.-flag carrier is seeking to carry cargo and, although no

foreign-flag carrier is eligible to carry the cargo, the rate at which it is carried is directly influenced by a foreign-flag carrier or carriers."

**8.** None of the parties sought reversal or modification of the Board order through appeal to the Secretary. Instead AMA and States Marine International filed their complaints in

*Order of the District Court*

All of the parties moved for summary judgment. The court concluded that "the statute contemplates neither the relief sought by the Plaintiffs herein nor the partial relief granted by the Board".[9] In granting the motion of the intervenor, AIMS, the court held:

> "There is no indication that Congress ever intended that ODS payments would be either eliminated or proportionally reduced due to the carriage of preference cargo. The statute speaks in terms of necessity for foreign competition in a 'service, route, or line', not in terms of competition as to each kind of cargo carried. Thus, the Act subsidizes vessels not cargo."

The court found "convincing Intervenor's presentation of the legislative context of subsidy and preference cargo legislation and the absence of any affirmative indications of Congressional action to alter an administrative interpretation of 37 years standing, especially where Congress was aware of the situation and in the interim enacted rather specific amendments to the statutes in question."[10]

With this background, we turn to the issues raised by the respective parties on these appeals.

## I. ODS AND THE CARRIAGE OF PREFERENCE CARGO

The primary issue is whether, under the Merchant Marine Act of 1936, when a vessel carries preference cargo, (1) any award or payment of ODS is precluded, as plaintiff-appellant, AMA, contends; or (2) no limitation or reduction in ODS

may be made by the Board, as the court found and intervenor-appellee, AIMS, contends; or (3) the requirements and reductions imposed by the Board are permissible under its rule making power, as the Board found and the federal appellants contend.

### A. The 1936 Act

■ The language of the Merchant Marine Act of 1936 and its legislative history indicate that the legislation was intended to help develop an American merchant fleet that would be competitive with foreign flag fleets. The payment of operating subsidies was aimed toward this goal and is the primary tool Congress sought to use in bringing American shippers to a parity with foreign competitors.

Section 601(a) of the Act, 46 U.S.C. § 1171(a), which was set out above, provides that the payment of subsidies to promote American shipping may be granted only if required to meet "competitive conditions". Section 603(b) of the Act, 46 U.S.C. § 1173(b), which provides the formula for determining the amount of subsidy which may be awarded, states that the payment shall be made in such a way as to equalize the costs of American vessels and ships of foreign registry which are "substantial competitors" with their American counterparts. Section 604, 46 U.S.C. § 1174, provides for additional subsidies to offset the effect of U.S. aid which may be paid to "foreign competitors".

This orientation toward paying subsidies in order to meet foreign competition is indicated also in the legislative history. In 1935, President Roosevelt in proposing the legislation spoke of the need to

---

these actions in August, 1972. A motion of AIMS for summary judgment for failure to exhaust administrative remedies was denied.

**9.** AIMS did not seek affirmative relief against the Board, because of its "uncertainty as to the actual extent to which the regulations will injure AIMS members". AIMS does contend, however, that the position of the Board is wrong and that the AMA proposal "would destroy a number of AIMS members". (Appellants' Brief, p. 34).

**10.** The district court rested its decision on an opinion of the Comptroller General, Opinion 10264 (1966). In that opinion the Comptroller General advised Senator Paul Douglas that ODS should not be reduced for carriage of military cargo:

> ". . . we believe that this legislative background and the long-established administrative subsidy is payable without reduction, even though a part of the cargo carried on a particular voyage is military cargo which is reserved for U.S.-flag vessels."

match subsidies given by other countries to their merchant ships in order to maintain "fair competition".[11] Committee reports to Congress contained the same type of statements.[12] Two witnesses testifying before House and Senate Committees were even more explicit in stating the objective of the subsidy measures. Alfred Haag, Chief Division of Shipping Research, United States Shipping Board Bureau, Department of Commerce, stated:

> "If we provide the aid that is necessary to place the American shipowner on an equality with the foreign shipowner, and also if we match the aid that other countries are rendering their merchant ships . . . we will also have ships that will enable American industry to go into the foreign field and sell its products." [13]

Karl Crowley, Solicitor of the Post Office and a chief draftsman of the Merchant Marine Act testified in response to a question about whether a subsidy would be awarded to ships not having foreign competition that:

> " . . . it [the Act] is intended . . . to provide for a subsidy to put our shipping on a parity with other foreign competitors. Naturally, if they have an exclusive trade, where there is not any competition at all, there is nothing to put them on a parity with." [14]

█ The Act and its history make it clear that the operating subsidy established in 46 U.S.C. § 1171 was intended by Congress to be paid in order to meet foreign competition. It does not appear that Congress intended that the subsidy would compensate shippers which had no actual or potential competition from foreign lines.

### B. Cargo Preference Legislation

Legislation requiring that certain shipments be made on United States ships was enacted both before and after the Merchant Marine Act of 1936. As early as 1904, Congress provided that American military cargo be shipped on American vessels. The provisions of 15 U.S.C. § 616a, enacted one year before the Merchant Marine Act required cargoes obtained through government loans to be shipped on American vessels. The 1936 Act itself created certain classes of preference cargo. Section 405 (since repealed) provided preference for shipments of United States mail. Section 212(d), 46 U.S.C. § 1122, called for the Board to seek cargo preferences. Section 901(a), 46 U.S.C. § 1241, required federal employees to travel on United States ships. In addition, sections 506 and 605(a) of the Act provide for certain reductions in subsidies when American ships are carrying domestic cargo which is completely protected from foreign competition. Of course, the cargo preference legislation primarily in question, 46 U.S.C. § 1241(b), providing that 50% of the relief and aid cargoes be carried in United States flag vessels, was not enacted until 1954, eighteen years after the passage of the Merchant Marine Act.

Intervenor-appellee argues that the cargo preference provisions predating the Act, contained in the Act itself, and enacted subsequent to its passage indicate a Congressional awareness of preference laws over the three decades since the Merchant Marine Act established the operating differential subsidy. It is contended that this awareness coupled with Congressional inaction indicates that Congress did not intend that the subsidies be affected by cargo preferences. According to the Intervenor, "Where no provision was made, no subsidy reduction was intended."

11. H.R. Doc. No. 118, 74th Cong., 1st Session at 1 (1935).

12. *Id.* at 29, 30. Senate Rep. No. 898, 74th Cong., 1st Session at 2 (1935).

13. Hearings on H.R. 7521 before House Committee on Merchant Marine and Fisheries, 74th Cong., 1st Session at 833 (1935).

14. Hearings on S. 3500, S. 4100 and S. 4110 before the Senate Committee on Commerce, 74th Cong., 2d Session at 60–61 (1935).

 It is true that the legislative history of the various preference acts manifests a Congressional awareness that subsidies might be paid to preference cargo carriers. In fact, it appears that Congress intended that subsidized vessels could carry preference cargo.[15] Recently the Ninth Circuit held that the Merchant Marine Act does not prohibit the carriage of preference cargo by subsidized carriers. *Columbia Steamship Company, Inc.* v. *American Mall Line, Ltd.* et al., 510 F.2d 29 (9th Cir. 1975). We agree and thus reject the contention of AMA that no subsidies may be paid to vessels carrying preference cargo.

However, while the Act may contemplate the payment of subsidies to preference carriers, we agree with the federal appellants that the legislative history does not show that Congress was aware over the years that subsidized lines might end up with a concentration of preference cargo not subject to foreign flag competition, as the plaintiffs maintain has occurred and which precipitated this litigation.[16] There is nothing to indicate that Congress ever considered the problem of a possible concentration of preference cargoes among subsidized lines until 1970. That year Congress passed Public Law 91–469, which substantially amended the Merchant Marine Act.

Informed during the hearings on the 1970 amendment of the proceedings in Docket No. S–244, which were at that time awaiting Board determination, the respective House and Senate committees stated that their recommendations were not to be construed as indicating a position with respect to the Board proceedings,[17] and witnesses at the committee hearings stated that the amendments would not influence the outcome of the proceedings.[18] It would have been a simple matter to resolve the issue through appropriate legislation but Congress left the solution of the subsidy-preference cargo problem to the Maritime Subsidy Board by providing in Section 40(a) of the 1970 Act (84 Stat. 1037) that:

> "Nothing in section 16 of this Act amending section 603 of the Merchant Marine Act, 1936, or in the contracts made thereunder, shall be deemed to affect or change existing law or contracts with respect to the proceedings now pending before the Secretary of Commerce relating to the payment of subsidy in respect of cargoes covered by section 901(b)(i) of the Merchant Marine Act, 1936, section 616(a) of title 15, United States Code, or section 2631 of title 10, United States Code."

And since there is no indication that Congress knew of the problem until 1970 it cannot be taken to imply approval of a policy that subsidies be awarded without regard to the competitive nature of the shipments.

C. *Decision of the Board and Rule Proposed for Adoption*

Based on a review of an "extensive factual record" developed through "extensive hearings", the Maritime Subsidy

---

15. For example, during the debate in the House on the Wheat for Pakistan Act, Rep. Shelly stated in 99 Cong.Rec. 7091:

 "It does not make sense for us to start the building of them to subsidize the operation of them, and then give them nothing to carry . . . So, as a result, the policy was established that at least 50 percent of this material that we give them . . . should go in our vessels so that we would not be wasting the money that we spent to build them and the money we paid to subsidize the operation of them; so that we could keep them alive and keep them going."

16. The Examiner found, *inter alia*, that (1) subsidized lines participated significantly in the preference cargo market, (2) subsidized and unsubsidized lines in some instances compete vigorously for the carriage of military and open-rated civilian preference cargo not subject to foreign competition, and (3) on some routes subsidized lines concentrated heavily on carriage of preference cargo not subject to foreign-flag competition.

17. See H.Rep.No.91–1073, 91st Cong., 2d Sess. at 39 (1970) and S.Rep.No.91–1080, 91st Cong., 2d Sess. at 34 (1970), U.S.Code Cong. & Admin.News 1970, p. 4188.

18. See 1970 S. Hearings at 126 and 1970 H. Hearings at 647.

Board, in a detailed opinion and order, concluded that the Board's previous policy of awarding subsidies to preference cargo carriers without regard to the competitive nature of their shipments required modification. The Board noted that before the proceeding in Docket No. S–244 the relationship between ODS payments and cargo subsidy laws was never examined in depth by the Board or its predecessors.[19] With "exceptions of minor significance", the Board had not theretofore drawn any distinction between carriage of preference cargo and non-preference cargo. The economic data presented[20] convinced the Board that this policy should be changed. The Board concluded on the basis of the evidence presented and its interpretation of the relevant statutes that the rule it proposed for adoption reflected the competitive requirements of the Merchant Marine Act as they relate to carriage of preference cargoes[21] and should govern the future administration of the ODS and CDS programs. The Board held that the rule would apply prospectively to all ODS contracts existing on the effective date of the rule[22] and to all new ODS contracts made after that date.[23] The order provided further that nothing stated therein "should be construed as rendering illegal any prior acts, policies, rulings or interpretations of the Secretary, the Board or the Maritime Administration (and predecessor bodies) under the ODS and CDS programs".

■ The question arises as to whether the change in policy, particularly with respect to existing contracts, could be effected in the rule making proceeding conducted by the Board. In Section 204(b) of the 1936 Act, 46 U.S.C. § 1114(b), the Secretary of Commerce was "authorized to adopt all necessary rules and regulations to carry out the powers, duties and functions vested in him by the Act". We agree with the federal appellants that under this grant of authority the Secretary, and through him the Board, has broad discretionary authority to deal with the everchanging technological and economic conditions of the commercial shipping industry, as long as its actions are reasonable and consistent with the 1936 Act.[24]

**19.** AIMS refers to reports to Congress from various government agencies, prior to the S–244 proceedings, showing an increase in the carriage of preference cargo subsidized lines. We agree with the federal appellants, however, that these reports did not provide either the Board or Congress a basis, for concluding, prior to the S–244 proceedings, that subsidized lines were concentrating heavily on the carriage of preference cargo to the exclusion of substantial amounts of cargo open to foreign-flag competition.

**20.** The data included subpoena responses filed by every U.S.-flag carrier operating in the U.S. foreign commerce, reports and testimony of economic consultants for the parties, and testimony (and supporting documentation) of numerous government agencies (including all agencies responsible for movement of preference cargoes) and officials of subsidized and unsubsidized carriers.

**21.** The Board recognized that the Act does not require absolute and complete foreign competition, but rather "substantial" competition.

**22.** The AIMS members have 20 year operating subsidy contracts made in the period 1955–1958.

**23.** In rejecting AIMS' argument that any rule adopted may not be applied to existing ODS contracts, the Board noted that all contracts provide that:

"In order to induce favorable action upon its application for financial aid provided for in this Agreement the Operator . . . does hereby warrant and represent, among other things, as follows . . .

H. . . . *Events of Default.* The following shall constitute events of default under this agreement:

. . . . .

(f) Failure by the Operator to comply with any applicable provision of the Act, any law administered by the . . . Maritime Administration, *or any rule or regulation of the . . . Maritime Administration published in the Federal Register, relating to the operation of subsidized vessel(s)."* (Emphasis added by Board).

**24.** The report of the Senate Committee on Commerce noted:

"Title II creates a Maritime Authority . . . The Authority is given a considerable amount of discretion in the solution of its problems. This discretion is necessary

Section 606 of the Act, 46 U.S.C. § 1176, provides for Board review and readjustment of future ODS payments. The Board "on its own motion or application of the contractor shall, after a proper hearing, determine the facts and make such readjustment in the amount of future payments as it may determine to be fair and reasonable in the public interest. . . . Its decision shall be based upon and governed by the changes which may have occurred since the date of the said contract." The decision "shall be promulgated in a formal order, which shall be accompanied by a report in writing in which the Board shall state its findings of fact".

The question is thus whether the contractors received a "proper hearing" within the meaning of Section 606. It is clear from the record and all parties agree, that the hearings conducted by the Board were extensive and that all interested parties presented evidence and briefs in support of their respective positions. In its motion to intervene in these cases, AIMS stated that it is an association "composed of 12 steamship companies, all but one of which is a party to an operating-differential subsidy ('ODS') contract under the Merchant Marine Act, 1936, and each of which owns and/or operates certain vessels built with the assistance of construction-differential subsidy ('CDS') under said Act"; and that "AIMS was a party to Maritime Subsidy Board Docket S–244, representing the interest of its members in that proceeding". It sought and was granted intervention under F.R.Civ.P. Rule 24(a).[25]

■ Moreover, as noted *supra* (Note 23), all ODS contracts provide that "failure to comply with . . . any rule or regulation by the Maritime Administration published in the Federal Register, relating to the operation of subsidized vessel(s)" shall constitute an event of default under the contract. In our opinion the Board was correct in concluding that by reason of this provision each ODS contract "is expressly subject to any reasonable interpretation of the 1936 Act by the Maritime Administration and any rule or regulation, applied prospectively, implementing such interpretation".

■ While a close question of statutory intent is presented, we conclude that in the circumstances of this case a hearing received in the context of formal rule making constituted a "proper hearing" and the proposed rule may be applied prospectively with respect to both existing and new contracts.

It is next contended that the long standing administrative interpretation of the Act absent affirmative action by Congress precludes the Board's order and proposed rule. While the Board has not heretofore adopted any rule and in general has not in the past drawn a distinction between preference and non-preference cargoes in awarding subsidy contracts, it has in a number of decisions considered whether the vessel service as a whole met foreign flag competition. Although those cases vary in factual determinations and did not consider the precise question here presented, they do show the Board has clearly recognized its

since many questions will require prompt treatment. Shipping is a business of a highly competitive and changing nature, and its governmental contact must be given the power to prompt decision in dealing with situations as they arise."
S.Rep.No.713, 74th Cong., 1st Sess. at 4 (1935).

25. AIMS' memorandum in support of its motion reads in part:
"First, AIMS has an interest in the transaction. The standard is 'primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons

as is compatible with efficiency and due process.' *Nuesse, supra,* 385 F.2d at 700. [*Nuesse*] v. *Camp,* [128 U.S.App.D.C. 172,] 385 F.2d 694 (D.C.Cir.1967). AIMS is clearly concerned. Decision of the issues raised by plaintiff's complaint is of paramount importance to its member steamship companies which are ODS contractors and which as a matter of course carry reserved cargoes in substantial volumes. In these circumstances and with 'the greater impetus to intervention that inheres in administrative cases' [id.], AIMS must be considered to have the requisite interest in the transaction."

"responsibility to determine, among other things, what constitutes foreign-flag competition on a particular trade route, and whether such competition is substantial".[26] The Board held also that "diminution of competition must be considered in computing the amount of subsidy to be awarded" and "where foreign-flag competition is eliminated, the basis for award disappears. So, too, where competition has diminished from the level existing upon computation of the award, the basis for the award may be affected to the extent of the change in competition".[27] We agree with the federal appellants that the prior cases do not support the arguments of either AMA or AIMS and that the Board's interpretation of the foreign-flag competition requirement of section 601 is "consistent with and a further development of the interpretation contained in prior administrative decisions".

▮ Nevertheless, it is true, as the district court concluded and intervenor-appellee argues on this appeal, that the rule proposed by the Board in Docket No. S–244 does change a long standing administrative interpretation and that no affirmative action has been taken by Congress to change that interpretation. We are not persuaded, however, that under the factual situation and relevant statutes discussed *supra* the Board may not change its policy through adoption of the proposed rule. The question of an agency's power to change an established practice without legislative mandate has been considered by many courts. While the decisions are not uniform, due in large part to varying factual situations, the better rule appears to be that an agency is free to act when conditions change and is not tied to past practices, as long as its decisions are fairly reasoned and considered.

In *Columbia Broadcasting System, Inc. v. Federal Communications Commission*, 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (D.C.Cir.1971) this court stated that ". . . an administrative agency concerned with furtherance of public interest is not tied to rigid adherence to its prior rulings." In *Pennsylvania Water & Power Co.* v. *Federal Power Commission*, 74 U.S.App.D.C. 351, 358, 123 F.2d 155, 162 (1941), *cert. denied*, 315 U.S. 806, 62 S.Ct. 640, 86 L.Ed. 1205 (1942), this court held that succeeding department heads may reverse even a well established practice if convinced that the past course of action was incorrect.

The Supreme Court in *Helvering* v. *Wilshire*, 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101 (1939) considered a contention much like that of AIMS, that the enactment of statutes by Congress after administrative regulations had been issued precludes the Agency from changing those rules. In *Helvering* at 100–101, 60 S.Ct. at 24 the Court stated:

"It does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers."

▮ As noted *supra*, the district court relied heavily on a 1966 opinion of the Comptroller General advising Senator Douglas that ODS should not be reduced on a voyage basis for carriage of military cargo. While this opinion might be interpreted to mean that the 1936 Act does not authorize abatement of subsidy for any carriage of preference cargoes, we are persuaded that the Board was correct in concluding that the ruling "cannot be read that broadly". The opinion did not consider the issue presented to the Board in this proceed-

26. *Review of Grace Lines Subsidy*, Route 2, 4 F.M.B. 40 (1952).

27. *Lykes-Harrison Pooling Agreement*, 4 F.M.B. 515 (1954). *See also American President Lines, Ltd.*—Subsidy, Route 29, 4 F.M.B. 51 (1952); *Review of Mississippi Shipping Co.* —Subsidy Route 20, 4 F.M.B. 68 (1952); *Review of Farrell Lines*—Subsidy, Route 15A, 4 F.M.B. 117 (1952); *Moore-McCormack—Swedish Lines Sailing Agreement*, 4 F.M.B. 558 (1955).

ing of whether foreign-flag competition is being met when the operation of vessels for *annual* service derives more than 50% of gross freight revenues from cargoes not subject to foreign competition. Rather it held that ODS is "payable, without reduction, even though a part of the cargo carried on a *particular voyage* in *military cargo* is reserved for U.S. flag vessels". (Emphasis added). The 1966 opinion of the Comptroller General does not in our opinion preclude the adoption of the rule proposed by the Board. Moreover, the opinion would not be binding on the Board, particularly under a different factual situation.

Based upon the provisions of the Merchant Marine Act of 1936 and its legislative history, the interaction of the operating subsidy provisions of the Act and the cargo preference statutes, and the evidence considered by the Board following extensive hearings, we conclude that the determination of the Board and the proposed rule to effectuate its change in policy are proper. The Act consistently speaks of awarding subsidies only to vessels "meeting foreign competition". The legislative history, however, indicates that Congress had contemplated the payment of some "double subsidies" to shippers carrying preference cargo. Whether or not this is "unfair competition", as AMA contends, it was foreseen by Congress. The Board's rule reducing subsidy when a vessel is not in "substantial competition" appears to strike a sound balance between the intention of Congress and the competitive needs of the industry. Additionally, the Board's decision that subsidies should be based upon the amount of competition cargo carried during the year rather than upon other formulae suggested by the parties finds support in the language of the Act, which speaks of "service" instead of cargo or voyages.

Under the Administrative Procedure Act, 5 U.S.C. § 706, a reviewing court should not overturn the determination of an administrative agency unless it is "unsupported by substantial evidence" or is not in accordance with law. This court has held that this standard applies when a court is reviewing formal rule making proceedings under 5 U.S.C. § 553. *Automotive Parts & Accessories Association* v. *Boyd*, 132 U.S.App.D.C. 200, 407 F.2d 330, 337 (1968). The proceedings in Docket No. S–244 were formal proceedings.[28] We find that the decision of the Board is supported by substantial evidence and a proper interpretation and application of the law.

## II. CDS AND THE CARRIAGE OF PREFERENCE CARGO

AMA's appeal in No. 74–1502 raises the issue of whether the owner of a vessel built with a construction differential subsidy on which an operational subsidy has been paid is receiving a double subsidy and should be required to rebate the construction subsidy. The district court did not consider this issue, but noted that the "issues relating to construction differential subsidy were directly reviewed" in *American Maritime Association* v. *Stans, supra,* (note 28). The court viewed "such issues as precluded by the decision" in *Stans.* *Stans* was concerned with a Board order in Docket S–244, Sub. 1 (October 13, 1970) in which the Board ruled that the 1936 Act did not prohibit the carriage of military cargoes on vessels built with CDS and upheld charters to Military Sealift Command. In its order in Docket S–244, (June 12, 1972) the Board noted the opinion of the district court in *Stans* and extended "its conclusions" to hold that a vessel built with CDS may engage in carriage of preference cargo without

28. It should be noted that 5 U.S.C. § 553 did not require the Board to hold formal hearings to consider subsidy adjustments. However, as the district court stated regarding the Docket No. S–244, Sub. 1 proceedings, § 553 did not preclude the Board from choosing "to make the proceeding subject to the most rigorous requirements of the Administrative Procedure Act." *American Maritime Association* v. *Stans,* 329 F.Supp. 1179, 1182 (D.D.C.1971), aff'd, 157 U.S.App.D.C. 394, 485 F.2d 765 (1973). When formal proceedings are held, the "substantial evidence" standard in 5 U.S.C. § 706 is applicable.

abatement of subsidy. We agree with the Board and the district court on this issue.

The provision for CDS is contained in Title V of the Merchant Marine Act of 1936, 46 U.S.C. § 1151 *et seq.* As originally enacted Title V prescribed criteria for awarding CDS similar to those for ODS, including the requirement that the vessel be used in a service which was meeting foreign competition.

In 1952, however, Congress amended Title V and deleted reference to the requirement that a vessel which had received CDS be used to meet foreign competition.[29] Instead, the new criteria called for the Board to find that the vessel was to be used in "foreign commerce".[30] Again in 1970, the CDS provisions of the Merchant Marine Act were amended, allowing subsidies to be paid to shipyards as well as purchasers of vessels. The Report of the House Committee on the 1970 amendment made it clear that CDS has an entirely different purpose than ODS: "[T]he construction subsidies are subsidies to the shipyards, not to the shipowners."[31]

The purpose of the CDS program is to subsidize shipyards of this country to enable them to compete effectively with foreign shipyards. The subsidy allows a purchaser to buy a ship in the United States for a price equivalent to that charged by a foreign shipyard. The only restrictions on payment of CDS listed in 46 U.S.C. § 1151(a) are that the ship receiving subsidy be registered in the United States and be engaged in foreign commerce. Congress made no distinction between domestic purchasers who could or could not avail themselves of CDS. Instead, the section provides that all ship purchasers who qualify may buy ships which are eligible for CDS payments. The Act does not distinguish between those carrying preference cargo and those not carrying such cargo. A requirement that certain purchasers rebate their subsidy due to the type of cargo they carry would be contrary to the language in section 1151(a) and inconsistent with the Congressional purpose behind CDS of encouraging American ship building.

 The wording of the Merchant Marine Act and its history make it clear, in our opinion, that Congress did not intend to relate the payment of CDS to the vessel's actual involvement in foreign competition, nor require a rebate of CDS when a recipient ship hauls preference cargo. This conclusion is further supported by the analysis of the Board and by this court in the *Stans* decision.

## CONCLUSION

We conclude that the order of the Maritime Subsidy Board in Docket S–244 is a reasonable and proper determination of a difficult and complex situation, both factually and legally, and that the rule prepared by the Board may properly be adopted. We remand to the district court for a modification of its order in accordance with this opinion.

**29.** The only reference to foreign competition regarding CDS is in the general definition section of the Act, 46 U.S.C. § 1244(a). That section states that "foreign commerce" shall include for the purpose of CDS certain vessels trading between foreign ports if subsidy will enable them to compete with foreign-flag carriers. This section does not make foreign competition a prerequisite of a CDS award.

Instead it expands the definition of foreign commerce to include certain vessels which perhaps would not otherwise be included as CDS recipients.

**30.** 46 U.S.C. § 1151(a).

**31.** House Rep. No. 91–1073, 93 Cong.2d Sess., p. 30.