**COLONIAL FAST FREIGHT LINES, INC., Plaintiff,**

v.

**The UNITED STATES of America and the Interstate Commerce Commission, Defendants.**

Civ. A. No. 75-G-0220-S.

United States District Court, N. D. Alabama, S. D.

June 30, 1977.

George M. Boles, Carlton & Boles, Birmingham, Ala., E. Stephen Heisley, Ames, Hill & Ames, P. C., Washington, D. C., for plaintiff.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Fritz R. Kahn, Gen. Counsel, Interstate Commerce Commission, Jeffrey A. Knoll, Atty., Washington, D. C., Wayman G. Sherrer, U. S. Atty., Birmingham, Ala., for defendants.

## MEMORANDUM OPINION

Before GEWIN, Circuit Judge, and POINTER and GUIN, District Judges.

GUIN, District Judge:

The matter comes before this three-judge court, convened in accordance with 28 U.S.C. § 2284, on complaint filed by Colonial Fast Freight Lines, Inc. (Colonial), seeking to set aside, vacate, and annul certain orders of the defendant Interstate Commerce Commission (ICC) and to permanently enjoin enforcement of those orders. The case is properly before this court pursuant to 28 U.S.C. §§ 1336, 1398, and 2321–2325.[1]

Colonial is a motor common carrier, operating over irregular routes in interstate commerce pursuant to Certificate of Public Convenience and Necessity issued by the Interstate Commerce Commission in Docket No. MC–115840 and sub-numbers thereto. By order served February 25, 1974,[2] the ICC promulgated regulations, codified at 49 C.F.R. § 1065, permitting irregular-route carriers to file applications to eliminate "gateways"[3] in their operations.[4] The in-

---

1. By Pub.L. 93–584, 88 Stat. 1917, enacted by Congress on January 2, 1975, judicial review of ICC orders was shifted to the courts of appeals. Section 10 of the amendment provides, however, that the shift does not apply to actions commenced in the district courts on or before February 28, 1975. The instant action was commenced on February 20, 1975.

2. *Motor Common Carriers of Property, Routes and Service (Petition for the Elimination of Gateways by Rulemaking),* 119 M.C.C. 530 (1974) [Report of the Commission].

3. A gateway results from a motor common carrier combining or "tacking" two separate and unrestricted grants of irregular-route authority at a service point common to each (the gateway point) and conducting operations through the gateway from points served under one authorization to those served in the other. *Motor Common Carriers of Property, Routes and Service (Petition for the Elimination of Gateways by Rulemaking),* 119 M.C.C. 170 (1973) [Notice of Proposed Rulemaking and Order].

4. As the court pointed out in *Eagle Motor Lines, Inc. v. ICC,* 545 F.2d 1015, 1016 (5th Cir. 1977): "Before the ICC promulgated its gateway elimination rules, tacking could be accomplished only via the gateway. Of course, the shortest route between A and C might not be through B, and gateway tacking therefore wasted a lot of fuel. Prodded by the energy crisis of late 1973 and 1974, the ICC promulgated its gateway elimination rules, which allow carriers to go from A and C without passing through B. The rules prohibit gateway tacking except under certain limited circumstances." Therefore, one of the critical features of the *Gateway Elimination* regulations as adopted is that a carrier is "*prohibited* from joining any of

stant case arises from an application filed by Colonial under these regulations.

Under the system established by the ICC, irregular-route common carriers were required to file one of two types of applications to eliminate all gateways, depending upon the circuity [5] involved in the operation which is the subject of the application. If the circuity was less than 20 percent the Commission permitted eliminating the gateway automatically upon the submission of what is referred to as a "letter notice" or "E" application. Proof of circuity less than 20 percent presumes that there is no change in competitive position by virtue of the gateway elimination and that it would not be necessary for a carrier to prove "public convenience and necessity" under 49 U.S.C. § 307. If, on the other hand, the circuity involved exceeded 20 percent, it was necessary for a carrier to file an "OP–OR–9" or "G" application, which would be judged under the standard of "public convenience and necessity." The application which Colonial filed from which the instant case arises was an "E" application.

Under 49 C.F.R. § 1065.1(a) a carrier was permitted to eliminate gateways and thus provide a direct, through service upon the satisfaction of several conditions:

1. The certificated authorities had to be issued pursuant to an application which was pending before the ICC on or before November 23, 1973;
2. None of the authorities to be "tacked" could be restricted against such joinder;
3. The most direct highway distance between the points to be served had to be not less than 80 percent of the highway distance over the authorized routing through the gateway;
4. A tariff had to be on file on November 23, 1973, unless the application was granted subsequent to that date; and,

5. Procedures enumerated in 49 C.F.R. § 1065.1(d)(1) had to be followed.

Colonial's satisfaction of the first four conditions is not questioned. However, the ICC rejected Colonial's application because it did not comply with one of the procedural requirements covered by the fifth condition.

■ The Colonial application to eliminate certain gateways, which is the subject matter of this case, derives from authority issued by the ICC, pursuant to an application pending on November 23, 1973. Section 1065.1(d)(1)(iii) of 49 C.F.R. provides that "In such instances, the carrier shall make such filing [of the gateway elimination application] within 60 days from the date of issuance of the authority in issue." Colonial was "issued" its authority on June 27, 1974, in the sense that the Commission stamped the certificate as mailed to Colonial on that date. However, Colonial states that it did not receive such mail until July 15, 1974 (18 days later). The ICC does not contend otherwise. Thus, instead of the 60-day filing period provided by the regulations, Colonial had but 42 days prior to the deadline established by the regulations (August 26, 1974) in which to prepare its application.

When Colonial filed its application on September 9, 1974, the ICC determined that it was late and rejected it. Denying Colonial's petition for a determination that the application be considered timely filed or, alternatively, for leave to late-file the application, the agency stated that "no sufficient or proper cause has been demonstrated." (Order of Commissioner Rupert L. Murphy, served September 23, 1974, *aff'd* by Order of Division 1 of the ICC, Acting as an Appellate Division, served December 4, 1974.) Because this court believes that a carrier filing an "E" application is entitled to the entire 60-day period allowed by the ICC's rules (less 2–3 days normally to be

---

its irregular route certificated authorities on or after the effective date of this regulation," unless it successfully prosecutes a *Gateway Elimination* application. 49 C.F.R. § 1065(b).

5. "Circuity" means the degree of excess mileage required on movements over gateways as opposed to the direct movement between origin and destination measured as a percentage arrived at by dividing the excess mileage by the mileage over the gateways.

expected for the receipt of United States mail) and because Colonial lost approximately one-fourth of the allotted time due to mail delay, we are compelled to reverse and remand this case to the ICC.

The court's attention has been directed to the decision of the United States Court for the Northern District of Ohio in *Keen Transport, Inc. v. United States,* No. C75–170 (N.D.Ohio, filed Aug. 6, 1976).[6] That court found, in the context of a "G" application, that the 60-day time limit imposed by the ICC for filing applications was itself unreasonable. We agree with the reasoning of the *Keen* court; and it would hardly be unreasonable to apply that rationale to this case. However, it is not necessary for this court to make a determination of the per se reasonableness of the 60-day time limit when applied to "E" applications to make a final determination here. Even if a consideration of the evidence before us in the case of an "E" application led us to conclude that the 60-day time limit is facially reasonable, nevertheless, we find the wooden application of the 60-day rule to be unreasonable.

Because of the short time available, the peculiar facts of this case created a pressing need for waiver of the time limit rule. The ICC's refusal to consider this pressing need was arbitrary and capricious. *See, Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Furthermore, its failure to find such pressing need to be sufficient and proper cause for waiving the time limit was itself arbitrary and capricious.

 Defendants suggest that the ICC should be permitted to strictly apply the time limit. Assuming (without deciding) the time limit to be facially reasonable, we still cannot agree. First, we note that any application of a time limit must not be arbitrary and capricious. *See, National As-*

*sociation of Independent Television Producers and Distributors v. FCC,* 502 F.2d 249 (2nd Cir. 1974). As we discussed above, holding Colonial to the 60-day time limit was not reasonable but, rather, arbitrary and capricious. Second, we also recall that it is the established philosophy of both the Fifth Circuit and of the United States District Court for the Northern District of Alabama to apply time limitations liberally when necessary to reach the merits of a case rather than deciding it on the basis of procedural technicalities. The ICC's action was certainly contrary to this philosophy. Indeed, such action by the ICC seems contrary to its assurance to the trucking industry that, "[c]ertainly no investments by carriers are being endangered by our action here." [7]

 In the case of *Squaw Transit, supra,* the United States District Court for the Northern District of Oklahoma considered at length the plaintiff's contention that the ICC was according inconsistent treatment under 49 C.F.R. § 1065 to different carriers who were similarly situated. After the *Squaw Transit* case was remanded to the ICC because the court found that the ICC had abused its discretion, a general policy statement was published by the ICC in the Federal Register. 41 F.R. 2459. The ICC announced in that statement that it was reopening certain cases filed under Section 1065, stating: "[C]arriers which have exhausted numerous man-hours in attempting to comply with the regulation will not see their efforts rendered futile." However, this new policy did not apply to Colonial. Defendants contend that it should not.

For the same reasons expressed by the court in *Keen Transport, supra,* we find the defendants' distinction of the case at bar from those to which the ICC's policy statement applied unpersuasive. *Squaw Transit,*

---

**6.** This court stayed proceedings in the instant case pending the decision of the *Keen* case and also that in *Squaw Transit Co. v. United States,* 402 F.Supp. 1278 (N.D.Okl.1975). The stay was predicated upon the identity of issues raised in those cases and the one at bar. (Order of Judge Guin, Sept. 8, 1975).

**7.** *Motor Common Carriers of Property, Routes and Service (Petition for the Elimination of Gateways by Rulemaking),* 119 M.C.C. 530, 537 (1974) [Report of the Commission].

*supra*, detailed the lack of uniformity involved in the treatment of applicants under 49 C.F.R. § 1065. In some cases late-filed applications were accepted; in others, they were not. In that case, late-filed evidence was rejected; in other cases, such evidence was considered. Colonial was subjected to this same sort of uneven treatment. For example, as the ICC itself pointed out in its brief to this court, the Commission processed letter-notices in *Blodgett Furniture Service, Inc.*, MC–3590 (Sub-No. 90), without questioning whether said notices were filed within the limitation period. In *Blodgett, supra*, the carrier filed a conventional application for a Certificate of Public Convenience and Necessity which was denied in its entirety. While it was pending, the gateway rules were promulgated and Blodgett attempted to file 79 letter notices and several "G" applications as part of that proceeding. The Commission denied the "G" applications, since Blodgett failed to meet its burden of proof. However, as stated above, the Commission processed the letter-notices ostensibly because Blodgett had filed them in connection with filing the pending proceeding. We therefore conclude not only that Colonial was treated unfairly, but also that the treatment accorded Colonial was in fact disparate.[8]

■ Further, the ICC seems to assume that because an "E" application is involved in this case, that application automatically and without exception can be easily and quickly compiled; while, on the other hand, a "G" application is always more difficult and time consuming to prepare. Although this is unquestionably true in some cases, this analysis fails "[t]o account for the wide divergence in carrier route authorities, with the concomitant greater number of required mileage analyses." *Keen Transport, supra*, at 8. It therefore ignores the sophisticated, tedious and time-consuming computations some carriers had to prepare prior to submitting their "E" applications. The record is replete with evidence that "E" applications (such as the one involved here) are in fact very time-consuming to prepare and that it would have been difficult at best to prepare the application in question in 57 days, and virtually impossible to do so in 42 days.[9] Argument has been advanced to the court and, indeed, Commissioner Murphy's order finally denying plaintiff's petition suggests (Order of Commissioner Rupert L. Murphy, supra) that Colonial should have begun preparation of its "E" applications prior to the issuance of its authority by the ICC. The law does not require a carrier to anticipate agency action which has not occurred. This court declines to impose such a burden.

■ In view of the peculiar circumstances of this case, particularly with respect to the admission by all parties that Colonial lost 15–16 (allowing 2–3 days mail time) critical days in which to file its application within the time limit, we conclude that the ICC acted arbitrarily and capriciously. The court is well aware that under the "arbitrary and capricious" standard the scope of review is a narrow one in which the reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" and that "the Court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. at 824.

8. We also note the recent decision of the Fifth Circuit in *Frozen Food Express, Inc. v. United States*, 535 F.2d 877 (5th Cir. 1976) which also involved actions by the ICC under 49 C.F.R. § 1065. In light of the General Policy Statement, the court therein cited the uneven-handed nature of these proceedings and concluded that "it would be unjust, inequitable, and discriminatory to deny FFE the same right of reopening its application." The case was thus remanded for a decision on the merits.

9. The court acknowledges that the decisions in *Squaw, Frozen Food* and *Keen Transport* dealt with "G" applications and not "E" applications currently before this court. However, we find unpersuasive the attempted distinctions between "G" applications and "E" applications involving numerous complex routes, as here. The critical factor to be considered is the amount of time and effort necessary to compile the necessary information and reduce it to the proper form for submission to the ICC.

However, in determining whether "the relevant factors" have been considered by the agency, the court may consider only a basis articulated by that agency in its order as supporting authority for that order. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) and *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). The Commission specifically considered the fact that Colonial did not receive its certificate until 18 days after its issuance but, nevertheless, rejected that reasoning stating "that petitioner failed to request in a timely manner any extension of the involved filing deadline." (Order of Commissioner Rupert L. Murphy, supra, at p. 2) Although there was some dispute raised at oral argument regarding whether such a request had been made, there was no dispute that any such request would have been denied. Thus, an application of the *Overton Park* standard to the factors articulated in its order rejecting Colonial's "E" applications reveals that the ICC has committed "a clear error of judg-. ment" in this case. Having found this action to be arbitrary and capricious, we are compelled to hold that such action is unlawful and set it aside. Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

Accordingly, for the reasons set forth above, the orders complained of are vacated, the matter is reversed, and the case is remanded to the Interstate Commerce Commission with direction that the application be accepted for filing and processed on the merits thereof.

REVERSED and REMANDED.

1. Within the preceding six months the Commission had reaffirmed its conclusion that the public interest would be served by issuance of the new authority to Colonial. The Commission's belief that the public interest would normally be served by gateway elimination in letter notice situations, such as here involved, is manifest from its practice of summarily granting letter notices when timely filed. Understandably, the Commission has avoided any attack upon the merits of Colonial's late-filed applications.

## MEMORANDUM OF DISSENT

POINTER, District Judge.

From the circumstances presented to it, the Commission might well have decided to grant Colonial's request for a waiver of the rules. There had been an abnormal delay between issuance of the new certificate and its receipt by Colonial. Within 60 days after that receipt, Colonial had completed the time-consuming process of computing its eligibility for "E" filings and had submitted its completed letter notices, eleven in all. The public interest would presumably be served by granting Colonial's applications.[1] The alternative to a waiver of the rules—a new regular application by Colonial showing public convenience and necessity—would entail more delay and expense. It can be argued that no prejudice would have resulted to the Commission by grant of the waiver.[2]

In denying the requested waiver, however, the Commission concluded that Colonial "had more than sufficient notice to prepare and submit its filings by the deadline" and that "no sufficient or proper cause has been demonstrated" for waiving the rules. These reasons, while summary in form, are discernible and understandable. *Cf. Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Colorado Interstate Gas Co. v. Federal Power Comm'n*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945). In support of these conclusions, the Commission had before it, from its own records or from Colonial's application, the following:

- Colonial was aware of the deadline, a deadline expressed as 60 days from *issuance* of the certificate, rather than

2. Looking solely to Colonial's applications, I would agree that no prejudice would result to the Commission from consideration of the letter notices. Indeed, such a consideration should be preferable from the Commission's standpoint to a processing of a new regular application from Colonial. However, as demonstrated in *Squaw Transit Co. v. U. S.*, 402 F.Supp. 1278 (N.D.Okl.1975), a waiver respecting Colonial's application could have significant—and prejudicial—impact upon the Commission's authority to reject other late-filed applications.

from receipt of the certificate. Colonial did not claim that it had received any incorrect or misleading advice, either from its own counsel or from the Commission. (Indeed, at trial, Colonial's counsel acknowledged that, in response to his oral inquiry, a Commission employee had stated that the time limits would be strictly enforced.)

- Colonial, so far as appeared, had made no special effort to monitor the issuance of the certificate by the Commission.

- Colonial, so far as appeared, did not commence any work on the applications until it had received the new certificate, and then assigned but one person to this important task. (At trial, these matters were conceded by Colonial's counsel.)

- While claiming to have worked arduously and diligently from that point forward, Colonial did not file the applications—eleven letter notices—until 57 days after receipt of the certificate. On such a schedule, Colonial would have been late in filing even if the certificate had been received only four days after its issuance.

- Colonial did not claim to have been surprised at the work required to complete the eleven letter notices. Indeed, it would have been hard-pressed to make such a contention in view of the fact that it had timely filed approximately a hundred letter notices which had been due on the June 4th deadline.

- Although at some point it must have realized it was not going to meet the deadline, yet Colonial did not within the filing period either (a) file partially complete letter notices, or (b) file any letter notices which it had completed, or (c) file any request for an extension of time.

- Colonial did not claim that its work on the letter notices had been delayed by illness, emergency, or any other such circumstance.

- There was no claim by Colonial that the Commission was guilty of unequal treatment respecting applications for gateway elimination whose deadlines were determined under the 60-day rule. (At trial it was apparently conceded that in no instance had the Commission considered applications or evidence filed more than 60 days after issuance of a new certificate.)

- Colonial actually had some 118 days (rather than 60) in which to complete its applications, more than twice the time in fact needed by it to do the work. On April 30, 1974, the Commission denied a petition for rehearing of its earlier decision which had granted Colonial's application for the additional operating authority. From that time forward, issuance by the Commission of the certificate was essentially but a ministerial function, subject only to submission by Colonial of certain documentation as to insurance, etc. (By delaying this documentation, Colonial presumably could even have obtained still further time for preparation of the letter notices.) No reason was given in the request for waiver as to why work on the letter notices had not, at least in part, been begun prior to receipt of the certificate—and, if this had been done, the letter notices could certainly have been filed by the August 26th deadline.

These circumstances, in my opinion, provide substantial support for the conclusions reached by the Commission in denying Colonial's request for a waiver. Were the matter being considered in this court *de novo*, I would probably have reached a decision contrary to the Commission's. However, as I view it, the standard for review—and this is no less true with respect to a procedural ruling than with respect to a substantive one—is narrowly drawn and does not permit the court to substitute its judgment for that of the agency. See *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Federal Communications Comm'n v. Schrieber*, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965). I am persuaded that the Commission's decision had a rational basis, was supported by sub-

stantial evidence on the record, and was neither arbitrary, capricious, nor an abuse of discretion. Accordingly, I would deny Colonial's complaint in the present case.

By changing the facts of this case, I might find myself in accord with the majority in holding the Commission's action to have been an abuse of discretion. For example, if Colonial had not received the certificate until one day before the letter notices were due, I too would have concluded that a decision denying a requested waiver should be overturned. But that is not the situation here—and in litigation of this type the particular combination of facts and circumstances is all important to the final outcome. So it is that the authorities cited to the court must likewise be scrutinized with care.

In *Squaw Transit Co. v. U. S.*, 402 F.Supp. 1278 (N.D.Okla.1975) and *Frozen Food Express, Inc. v. U. S.*, 535 F.2d 877 (CA5 1975), the courts were faced with Commission decisions not to allow late-filed evidence to supplement timely-filed applications for gateway eliminations. Both carriers had relied upon misleading advice from Commission personnel as to the effect of the deadline. In *Squaw*, 402 F.Supp. at 1289, it was noted that the carrier had been diligent in getting the required material to its counsel, but that the counsel had failed to file it timely due to a personal tragedy in his family. In *Frozen Food*, the court stressed that the effect of the Commission's decision was to halt tacking operations which the carrier had conducted for over 20 years and which had reached the level of 20,000,000 pounds of freight per year. Of great importance in both cases, the carriers established that the Commission had not acted evenhandedly, but had permitted other applications to be supported with late-filed evidence.

*Keen Transport, Inc. v. U. S.*, 446 F.Supp. 5 (N.D.Ohio 1976), involved an application filed seven days late. As in *Squaw* and *Frozen Food*, counsel for the carrier thought his request for an extension had been granted. Also like *Squaw* and *Frozen Food*, the court was dealing with the June 4th deadline, where, with thousands of applications being filed, the Commission was found to have acted inconsistently. Indeed, the sole issue in *Keen*, as defined by the court, was whether the Commission had acted arbitrarily and capriciously in failing to apply uniformly the pertinent deadline.[3]

The decisions in these three cases—directing the Commission to consider the applications in question on their merits—were grounded upon findings that the Commission, in attempting to administer the filing requirements during the flurry of activity around the general June 4th deadline, had not given equal treatment to carriers similarly situated. No such showing has been made in the case *sub judice*.[4] Indeed, as previously indicated, the Commission apparently treated Colonial no differently than it had any other carrier required to file within 60 days after issuance of a new certificate. In the only cases called to this court's attention involving late filing under this special 60-day rule, relief has been denied to the carrier. *West Motor Freight, Inc. v. I.C.C.*, 547 F.2d 1166 (CA3 1976); *Dart Truck Co., Inc. v. I.C.C.*, 555 F.2d 555 (CA6 1977). The Third Circuit's rationale is not indicated, its summary denial having been issued without formal opinion. A review of the pleadings and briefs reflects that the delay there involved, of almost four months, was not attributed to delay in receipt of the certificate, but to a different (and apparently erroneous) interpretation of the filing requirements by the carrier's counsel.[5] It is

---

3. The court in *Keen* did express its view that the time limits specified in the gateway elimination rules were inherently unreasonable. To the extent this dicta may have been intended to relate to the 60-day rule here involved, I would disagree.

4. Inconsistent treatment by the Commission in enforcing the June 4th deadline, brought about

the thousands of applications due at that time, cannot fairly be said to infect its enforcement of the 60-day rule, which involved individual deadlines over an extended period of time.

5. Counsel for the carrier in *West* had interpreted the 60-day filing requirement as inapplicable (due to the new certificate being issued under a

perhaps of some significance that counsel for the carrier attempted to draw support from the *Squaw* decision, while making no claim that there had been disparate treatment of carriers faced with the 60-day rule. In *Dart Truck*, involving a delay from apparent oversight by the carrier, the Sixth Circuit refused to hold the Commission's ruling as arbitrary or capricious even where the necessary letter applications had actually been received—albeit prematurely—before the deadline.

In sum, the decisions in *Squaw, Frozen Food, Keen, West* and *Dart Truck* are not controlling or, indeed, particularly helpful to Colonial in evaluating the facts of the case *sub judice*. The decision which the Commission had to make on Colonial's request for a waiver was one which it might be called upon to defend against contentions of unequal treatment, whether raised by Colonial (on denial of the request) or by other delinquent carriers (on grant of the request). Colonial, mindful of the remote possibility that those who had unsuccessfully protested the grant of new authority might commence and prevail in judicial proceedings, took a calculated risk not to begin work on its letter notices until the new certificate was in hand. Its "penny-wise" choice had potential "pound-wise" consequences, inherent in the nature of any limitations period. I would allow to stand the Commission's decision not to relieve Colonial from the consequences of that choice.

modification petition, rather than an original application), or as already satisfied (due to timely filed letter notices under the original authority, which subsequently was merely enlarged to include additional commodities), or as not yet matured (due to the omission from the certificate of language which the Commission had indicated would be included).