ALASKA BULK CARRIERS, INC., et al., Plaintiffs,

v.

Malcolm BALDRIGE, et al., Defendants,

and

Falcon World Shipping Corporation, et al., Intervenors-Defendants.

Civ. A. No. 81–936.

United States District Court, District of Columbia.

June 24, 1982.

4. The ordinance in question applies to all peddlers, canvassers, solicitors, transient vendors of merchandise, and non-profit charitable organizations, without regard to the purpose of solicitation. Although there is some suggestion in plaintiffs' post-brief that the Frontenac ordinance does not apply to persons approaching citizens door-to-door who were seeking only information and not money or subscriptions, plaintiffs failed to advance this contention in their complaint. In addition, plaintiffs do not seem to be claiming that defendants are attempting to regulate the content of speech, or that Frontenac officials are enforcing the ordinance in a discriminatory fashion.

5. This Court recognizes that the various district courts which have considered the validity of an ordinance which has restricted the hours of solicitation and canvassing from 9:00 a. m. to 6:00 p. m. have been split in their conclusions. This type of ordinance was upheld in *Westfall v. Clayton County,* 477 F.Supp. 862 (N.D.Ga. 1979), *McMurdie v. Doutt,* 468 F.Supp. 766 (N.D.Ohio 1979), and stricken in *Citizens For A Better Environment v. Village of Fields,* 511 F.Supp. 104 (N.D.Ill.1980); *Connecticut Citizens, Etc. v. Town of Southington,* 508 F.Supp. 43 (D.Conn.1980). This Court believes in light of the guidelines set down by the Supreme Court that the former decisions reached the correct conclusion and provide the better reasoning.

Edward Aptaker, Edward Schmeltzer, Schmeltzer, Aptaker & Sheppard, Washington, D. C., for plaintiffs.

Judith Ledbetter, Civ. Div., Dept. of Justice, Washington, D. C., for defendants.

Robert J. Blackwell, Washington, D. C., for intervenors-defendants.

## MEMORANDUM

JOHN LEWIS SMITH, Jr., Chief Judge.

Plaintiffs, the owners and operators of unsubsidized United States-flag tanker vessels, bring this action to set aside an award of a construction differential subsidy (CDS) by the Department of Commerce's Maritime Subsidy Board. Falcon World Shipping Corporation, which received the CDS as an aid in the construction of two tankers, intervenes as a defendant. The action is before the Court on defendants' motion to dismiss for lack of standing and on plaintiffs', defendants' and intervenor-defendants' cross-motions for summary judgment.

## I.

The Merchant Marine Act of 1936, 46 U.S.C. § 1101 *et seq.* (1976 & Supp. III 1979), is designed " 'to foster the development and encourage the maintenance' of a large and effective merchant marine capable of meeting the Nation's future commercial and military needs." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 584, 100 S.Ct. 800, 807, 63 L.Ed.2d 36 (1980) (quoting 46 U.S.C. § 1101 (1976)). In pursuit of these objectives, the Act establishes a number of grant and loan programs, including the CDS program at the core of the present litigation. *See* 46 U.S.C. § 1151 (1976).

Section 501(a) of the Act authorizes the Secretary of Commerce to award a CDS constituting up to fifty percent of the cost of constructing a proposed vessel in the United States. 46 U.S.C. § 1151(a) (1976). Prior to making the award, however, the Secretary must determine that

(1) the plans and specifications call for a new vessel which will meet the requirements of the foreign commerce of the United States, will aid in the promotion and development of such commerce, and be suitable for use by the United States for national defense or military purposes in time of war or national emergency; (2) if the applicant is the proposed ship purchaser, the applicant possesses the ability, experience, financial resources, and other qualifications necessary for the operation and maintenance of the proposed new vessel; and (3) the granting of the aid applied for is reasonably calculated to carry out effectively the purposes and policies of [the Merchant Marine Act].

*Id.* In making these determinations, the Secretary may exercise "considerable discretion." *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 586 n.26, 100 S.Ct. at 808 n.26.

The owner of the proposed vessel must be a citizen of the United States and must agree that the vessel be constructed in and documented under the laws of the United States. 46 U.S.C. § 883 (Supp. III 1979). The owner must also agree, in accordance with section 506 of the Act, to operate the vessel only in the foreign trade, which encompasses trade between a United States port and a foreign port as well as trade between a foreign port and another foreign port. 46 U.S.C. § 1156 (1976). Under either of two exceptions specified in section 506, however, the owner may operate the vessel in the domestic coastwise trade. *Id.* The first of the two exceptions permits the owner to operate the vessel in the domestic

coastwise trade as an adjunct to certain specified foreign voyages. *Id.* The second exception permits the owner to operate the vessel in the domestic coastwise trade for up to six months in any twelve-month period upon a determination by the Secretary of Commerce that the vessel's transfer into the domestic coastwise trade "would be necessary or appropriate to carry out the purposes of [the Merchant Marine Act]." *Id.* To ensure that a vessel constructed with CDS and operating in the domestic coastwise trade pursuant to one of the two exceptions does not obtain an unfair competitive advantage over unsubsidized vessels similarly employed, section 506 also provides that the owner of the vessel must repay that portion of the outstanding CDS allocable to the vessel's domestic operations. *Id.*

In this case, Falcon World Shipping Corporation filed an application with the Maritime Subsidy Board on October 26, 1979 for a CDS to aid in the construction of four 34,000 dead weight ton (DWT) product tanker vessels. Falcon indicated in a later amendment to its application that it was attempting to reach an agreement with the Military Sealift Command (MSC), a branch of the Department of Navy that provides ocean transportation for personnel and cargoes for the Department of Defense and other federal agencies, concerning the substitution of these four new tankers for four of Falcon's existing 37,000 DWT tankers already under charter to MSC but not constructed with CDS. Under the terms of the charters on Falcon's four existing tankers, MSC possessed renewal options on an annual basis through 1989 and 1990.

On several occasions, plaintiffs requested the Maritime Subsidy Board to deny Falcon's application. On January 19, 1981, however, the Board approved a CDS award of $70.4 million to Falcon for the construction of two, as opposed to four, 34,000 DWT tankers. According to the specifications of the CDS award, the two new tankers are to contain several operational and cost-saving improvements over Falcon's existing tankers.

The Board conditioned the CDS award on an agreement to be entered into between Falcon and MSC for the substitution of the two new tankers for two of Falcon's four existing tankers already under charter to MSC. Under the agreement, the two new tankers are to be substituted in 1983 and 1984, at which time the replaced tankers may enter either the foreign trade or the domestic coastwise trade. The two new tankers are to be chartered to MSC until 1988 and 1989, at which time MSC has options to renew the charters until 1993 and 1994.

On February 5, 1981, plaintiffs petitioned the Secretary of Commerce to review the Maritime Subsidy Board's decision to award the CDS to Falcon. On February 19, 1981, the Secretary denied plaintiffs' petition.

## II.

Independent of their claims under the Merchant Marine Act, plaintiffs present a claim based on the procedural safeguards of the Administrative Procedure Act (APA). Plaintiffs assert that the Maritime Subsidy Board failed to comply with section 555(e) of the APA, 5 U.S.C. § 555(e) (1976), in making its decision of January 19, 1981. Plaintiffs insist that, as a result, the Board's decision must be set aside, in accordance with section 706(2)(D) of the APA, 5 U.S.C. § 706(2)(D) (1976), as "without observance of procedure required by law."

■ Section 555(e) states that a denial of a petition or request in an "agency proceeding" shall be "accompanied by a brief statement of the grounds for denial" except "in affirming a prior denial or when the denial is self-explanatory." 5 U.S.C. § 555(e) (1976). Even if the Board did fail to comply with section 555(e), however, the facts of this case do not justify setting aside the Board's decision pursuant to section 706(2)(D). Plaintiffs have alleged no prejudice that they suffered as a result of the Board's alleged failure to comply with section 555(e). *United States Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519, 525 n.10 (D.C.Cir.1978). *Cf. Colonial Fast Freight Lines, Inc. v. United States,* 443 F.Supp. 72, 77 (N.D.Ala.1977).

## III.

Plaintiffs raise two sets of challenges under the Merchant Marine Act to the Maritime Subsidy Board's decision of January 19, 1981. First, plaintiffs argue that the Board incorrectly made three of the determinations required by section 501(a) of the Merchant Marine Act, 46 U.S.C. § 1151(a) (1976). The determinations at issue are that the two new tankers "will meet the requirements of the foreign commerce of the United States," 46 U.S.C. § 1151(a)(1) (1976), that the two new tankers "will aid in the promotion and development of such commerce," *id.*, and that "the granting of the aid applied for is reasonably calculated to carry out effectively the purposes and policy of [the Merchant Marine Act]," 46 U.S.C. § 1151(a)(3) (1976). Second, plaintiffs argue that the Board's approval of the substitution agreement entered into between Falcon and MSC violated section 506 of the Merchant Marine Act, 46 U.S.C. § 1156 (1976), which prohibits vessels constructed with CDS from entering the domestic coastwise trade.

█ In considering each of these claims, the Court must determine whether the Board's decision is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2) (1976). In so doing, the Court may not substitute its judgment for that of the Board. Rather, the Court may only decide whether the Board made a clear error of judgment. *See United States Lines, Inc. v. Federal Maritime Commission*, 584 F.2d at 526; *Shell Oil Co. v. Kreps*, 445 F.Supp. 1128, 1142 (D.D.C.1977), *rev'd on other grounds sub nom. Alaska Bulk Carriers, Inc. v. Kreps*, 595 F.2d 814 (D.C.Cir.1979), *rev'd on other grounds sub nom. Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980).

## IV.

Plaintiffs first argue that the Board violated section 501(a) of the Merchant Marine Act by incorrectly determining that the two new tankers "will meet the requirements of the foreign commerce of the United States." 46 U.S.C. § 1151(a)(1) (1976). According to plaintiffs, the two new tankers "will not serve either a military requirement (they will merely replace at substantially the same rates the two Existing Vessels) or a commercial requirement (they will not operate in the commercial marketplace)." Because this argument entirely misconstrues the phrase "the requirements of the foreign commerce of the United States," the Court rejects this argument as a matter of law.

█ To "meet the requirements of the foreign commerce of the United States," a vessel need only "engage[ ] in foreign commerce." *States Marine International, Inc. v. Peterson*, 518 F.2d 1070, 1083 (D.C.Cir. 1975). *See American Maritime Association v. Stans*, 329 F.Supp. 1179, 1185–86 (D.D.C. 1971), *aff'd*, 485 F.2d 765 (D.C.Cir.1973). "[F]oreign commerce," as that term is used in section 501(a) and throughout the Merchant Marine Act, *see* 46 U.S.C. § 1244(a) (1976), encompasses trade between a United States port and a foreign port as well as trade between a foreign port and another foreign port. There is no requirement in section 501(a), moreover, "that the granting of the construction differential subsidy be necessary to 'meet the foreign-flag competition.'" *American Maritime Association v. Stans*, 329 F.Supp. at 1186. Use of the term "foreign commerce" is "not a way of distinguishing between what laymen would denominate commercial (i.e., business) and non-commercial (i.e., non-business) transactions." *American Maritime Association v. Stans*, 485 F.2d at 768.

█ In this case, as a condition of the Board's award of CDS to Falcon, MSC is authorized solely to employ the new tankers in the "foreign commerce." Thus, in accordance with section 501(a), the two new tankers "will meet the requirements of the foreign commerce of the United States." This conclusion is not affected by the fact that vessels under military charter may encounter no foreign-flag competition. *American Maritime Association v. Stans*, 329 F.Supp. at 1186.

V.

Plaintiffs next argue that the Board violated section 501(a) by incorrectly determining that the two new tankers "will aid in the promotion and development of [the foreign commerce of the United States]." 46 U.S.C. § 1151(a)(1) (1976). After reviewing the statement of reasons submitted by the Board pursuant to an earlier order of this Court, however, the Court finds that plaintiffs' argument is unpersuasive. The Board's determination that the new tankers "will aid in the promotion and development of [the foreign commerce of the United States]" was based on a consideration of the relevant factors and does not represent a clear error of judgment.

Because the two new tankers are being constructed with CDS, and because the Board authorized MSC solely to employ them in the foreign commerce, they will be confined to the foreign commerce for their statutory lives. See 46 U.S.C. § 1156 (1976). Thus, assuming that the existing tankers upon being replaced remain in the foreign commerce either under another charter to MSC or some other arrangement, the new tankers will represent an addition of two tankers to the foreign commerce of the United States. The addition of this United States-flag tonnage, as the Board rationally concluded, will "aid in the promotion and development of [the foreign commerce of the United States]," especially in light of the fact that, as indicated by the administrative record, MSC often has foreign-flag tankers under charter because of the unavailability of United States-flag tankers.

Even assuming that the existing tankers upon being replaced enter the domestic coastwise trade, the two new tankers will still represent an addition to the United States foreign commerce. As the Board rationally concluded, the two new tankers are likely to remain deployed in the foreign commerce for a longer period of time than the existing tankers. First, the charters on the two new tankers, as noted above, will not expire until 1993 and 1994 if MSC exercises all of its renewal options. The char-

ters on the existing tankers, even if MSC exercises all of its renewal options, could extend at most into 1989 and 1990, approximately the dates on which the charters on the two new tankers will expire if not renewed at all by MSC. Second and more important, it is more certain that MSC would continue to renew the charters on the two new tankers than it would those on the existing tankers. The two new tankers, unlike the existing tankers, fully comply with the many international and United States regulatory standards for pollution abatement and safety that will become effective in 1986. See Port and Tanker Safety Act of 1978, P.L. No. 95–474, 92 Stat. 1471 (1978).

Implicit in the above analysis, as the Board recognized, is the fact that the two new tankers will also strengthen the fleet of United States-flag tankers. The two new tankers, unlike the existing tankers, will be modern, efficient and at the beginning of their economic lives. As indicated in the administrative record, moreover, the two new tankers "are the only vessels presently being constructed or presently in existence that meet all of MSC's design preferences and regulatory requirements."

In determining whether the two new tankers "will aid in the promotion and development of [the foreign commerce of the United States]," the Board also considered the nature of possible employment for both the new and the existing tankers after the expiration of their MSC charters. On the basis of this consideration, the Board again rationally concluded that the two new tankers "will aid in the promotion and development of [the foreign commerce of the United States]." The two new tankers, unlike the existing tankers, are almost certain to remain deployed in the foreign commerce of the United States after the expiration of their MSC charters. Deployment of the two new tankers subsequent to the expiration of their MSC charters should involve either new MSC charters or charters for the cargo preference trades, the commercial grain trades or other foreign trades that are profitable at the time.

## VI.

■ Plaintiffs also argue that the Board violated section 501(a) by incorrectly determining that "the granting of the aid applied for is reasonably calculated to carry out effectively the purposes and policy of [the Merchant Marine Act]." 46 U.S.C. § 1151(a)(3) (1976). After reviewing the statement of reasons submitted by the Board, however, the Court finds that plaintiffs' argument is unpersuasive. The Board's determination that "the granting of the aid applied for is reasonably calculated to carry out effectively the purposes and policy of [the Merchant Marine Act]" was based on a consideration of the relevant factors and does not represent a clear error of judgment.

The policy of the Merchant Marine Act is "to foster the development and encourage the maintenance of" a strong United States merchant marine. 46 U.S.C. § 1101 (1976). *See Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. at 584, 100 S.Ct. at 807. A strong merchant marine, as intended by Congress and as relevant in this case, must be "sufficient to carry ... a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping services essential for maintaining the flow of such ... foreign water-borne commerce at all times," "capable of serving as a naval and military auxiliary in time of war or national emergency," "owned and operated under the United States flag by citizens of the United States, insofar as may be practicable," and "composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel." 46 U.S.C. § 1101 (1976).

Plaintiffs do not reasonably contest the fact that the award of CDS to Falcon fosters each of the purposes quoted above directly from the Merchant Marine Act. To the extent that plaintiffs do, the Court finds no merit in their argument. Plaintiffs principally argue that, despite the fact that the award of CDS to Falcon may foster the purposes quoted above, it does not foster another, more important purpose of the Merchant Marine Act. According to plaintiffs, an additional purpose of the Merchant Marine Act is to protect domestic operators from detrimental increases in competition attributable indirectly to the operation of subsidized tankers. *Cf. Shell Oil Co. v. Kreps*, 445 F.Supp. 1128, 1142 (D.D.C.1978). The Board contravened this additional purpose of the Merchant Marine Act, plaintiffs claim, by providing for the replacement of two of the existing tankers with the two new, CDS-constructed tankers.

To the extent that one of the purposes of the Merchant Marine Act may be to protect domestic operators from this type of indirect competition from subsidized tankers, that purpose certainly is not the sole or primary purpose of the Act. At most, that purpose is one of several purposes to be considered and weighed by the Board in determining whether "the granting of the aid applied for is reasonably calculated to carry out effectively the purposes and policy of [the Merchant Marine Act]."

Despite believing it unnecessary to do so, the Board considered whether the award of CDS to Falcon protected domestic operators from detrimental increases in competition attributable to the replacement of two of the existing tankers with the two new, CDS-constructed tankers. The Board rationally concluded, based on the evidence in the administrative record, that the award of CDS to Falcon did not increase, or at least detrimentally increase, competition among domestic operators.

Plaintiffs challenge the Board's conclusion on this issue on two grounds. First, plaintiffs argue that the award of CDS to Falcon will cause the existing tankers to enter the domestic coastwise trade and thus further promote the gross over-supply of tankers in the domestic coastwise trade. Second, plaintiffs argue that the award of CDS to Falcon will discourage existing and future construction of unsubsidized tankers.

Plaintiffs first argue that, with the construction of the two new tankers pursuant to the CDS award to Falcon, the existing

tankers will enter and thus become a direct competitive factor in the domestic coastwise trade sooner than they would have without the construction of the two new tankers. As the Board recognized, however, this argument erroneously assumes that the existing tankers to date have not been a direct competitive factor in the domestic coastwise trade. The existing tankers were constructed without CDS and thus could have been operated at any time in the domestic coastwise trade by MSC or, if MSC had not exercised its renewal options, by Falcon. The domestic operators have had no guarantee that MSC would continue to use the existing tankers solely in the foreign trade or that MSC would continue to renew the charters on the existing tankers.

Even if plaintiffs' assumption is accepted, a study made part of the administrative record and relied on by the Board refutes plaintiffs' conclusion that the entry of the existing tankers into the domestic coastwise trade will further promote the gross oversupply in the domestic coastwise trade. The study indicates that from 1983, when the first CDS-constructed tanker will replace an existing tanker, until 1990, tankers with tonnage similar to that of the existing tankers generally will be in demand. From 1983 until 1985, tankers in the 20,000–39,000 DWT class, such as the existing tankers, are projected to be in slight over-supply. From 1986 until the last year analyzed by the study, 1990, these tankers are projected to be in significant demand. Indeed, in 1990, the shortage in the availability of these tankers is projected to be 873,000 DWT. The projected demand for these tankers should remain high, moreover, despite the fact that the surplus of tankers in other tonnage classes from 1986 until 1990 may impact on the demand for these tankers.

Plaintiffs also argue that the award of CDS to Falcon will discourage existing and future construction of unsubsidized tankers. After considering this argument, the Board rationally concluded on the basis of the evidence in the administrative record that the award of CDS to Falcon, with the resulting increase in probability that the existing tankers would enter the domestic

coastwise trade, would not deter any existing or future construction of unsubsidized tankers.

Because of the projected demand for tankers in the 20,000–39,000 DWT class, the entry of the existing tankers into the domestic coastwise trade at any time between 1983 and 1990 would not, in and of itself, result in the cancellation of any existing or future plans for the construction of unsubsidized tankers. As the Board cogently reasoned, "[t]he financial condition of the operator, tax laws, financing terms and availability, shipyard prices, and long term prospects for the domestic liquid bulk market have a much greater controlling effect on the development of plans for new unsubsidized construction for the domestic trade."

Furthermore, domestic operators with existing or future plans to construct unsubsidized tankers should have anticipated that, by 1986, the existing tankers might enter the domestic coastwise trade. For several years, it has appeared unlikely that MSC would exercise its renewal options on the existing tankers after 1986 because the existing tankers lack many of the international and United States regulatory standards for pollution abatement and safety that become mandatory in 1986. *See* Port and Tanker Safety Act of 1978, P.L. No. 95–474, 92 Stat. 1471 (1978).

## VII.

■ Plaintiffs finally argue that the Maritime Subsidy Board's approval of the substitution agreement entered into between Falcon and MSC violated section 506 of the Merchant Marine Act, 46 U.S.C. § 1156 (1976), which prohibits vessels constructed with CDS from entering the domestic coastwise trade. According to plaintiffs, the substitution agreement subsidizes the entry of two of the existing tankers into the domestic coastwise trade. After considering this argument and accepting *arguendo* plaintiffs' assumption here that the existing tankers would enter the domestic coastwise trade after being replaced by the two new tankers, the Board correctly con-

cluded as a matter of law that its approval of the substitution agreement did not violate section 506.

As stated above, only Falcon's two new tankers are, or will be, constructed with CDS. Falcon's existing tankers are constructed without CDS. Thus, even assuming that the existing tankers will enter the domestic coastwise trade after being replaced by the two new tankers, the Board's approval of the substitution agreement does not violate section 506 because no vessels constructed with CDS will be entering the domestic coastwise trade.

The Board's approval of the substitution agreement must be upheld unless section 506 or some other section of the Merchant Marine Act prohibits a person from owning or operating vessels constructed with CDS and engaged in the foreign trade at the same time that he is owning or operating vessels constructed without CDS and engaged in the domestic coastwise trade. Neither section 506 nor any other section of the Merchant Marine Act, however, in any way restricts a person from owning or operating vessels constructed with CDS and engaged in the foreign trade at the same time that he is owning or operating vessels constructed without CDS and engaged in the domestic coastwise trade. Indeed, the Merchant Marine Act only restrains a person from owning or operating either vessels receiving operating differential subsidies or vessels under charter from the Department of Commerce pursuant to section 704 of the Act, 46 U.S.C. § 1194 (1976), at the same time that he is owning or operating vessels constructed without CDS and engaged in the domestic coastwise trade. 46 U.S.C. § 1223(a) (1976).

### VIII.

Accordingly, plaintiffs' motion for summary judgment is denied and defendants' and intervenor-defendant's cross-motions for summary judgment are granted in their entirety.